**Sanjay Wadhwa**
**George N. Stepaniuk**
**Todd Brody**
**David C. Austin**
**Chevon Walker**
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-0080 (Brody)**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | **Civil No.** |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **Jury Trial Demanded** |
| | : | |
| **JOSEPH SPERA and JOLEINE, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Joseph Spera ("Spera") and Joleine, Inc. ("Joleine") (collectively, "Defendants"):

## SUMMARY OF ALLEGATIONS

1.      This case involves a serial insider trading scheme perpetrated by a group of stock traders that generated over $5.45 million in total profits for the group.  Spera was one of the traders that profited unlawfully from the scheme, making a total of over $1 million in illegal insider trading profits.  The primary component of the scheme was the systematic misappropriation of material non-public information from investment banks confidentially

marketing secondary stock offerings by publicly traded issuers.  The individuals who participated in this aspect of the scheme – including the leader Steven Fishoff ("Fishoff"), Paul Petrello ("Petrello"), Ronald Chernin ("Chernin"), Steven Costantin ("Costantin"), and Spera – together made a total of over $3.96 million by obtaining advance knowledge of the offerings from the investment banks and then, after tipping other members of the group, selling short the issuers' stock before the offerings were publicly announced.  The confidential offering information obtained by these defendants was material because the offering shares were sold by the issuers at a discount to the market price and diluted the holdings of existing shareholders.  As a result, the issuers' stock prices dropped substantially after the offerings were announced, thus enabling members of the group who shorted the stocks to cover their short sales at a hefty profit.

2.     Fishoff, Petrello, Chernin, and Costantin were previously charged by the Commission in a separate civil action, and each of them was also charged by the U.S. Attorney's Office for the District of New Jersey in parallel criminal proceedings.

3.     Fishoff orchestrated the scheme.  Using an entity named Featherwood Capital, Inc. ("Featherwood") as his principal trading vehicle, and other entities as well, Fishoff sold short the stock of numerous issuers in advance of dilutive offerings in which Fishoff or one of the other defendants was brought "over the wall" by the investment bank marketing the offering -- *i.e.*, provided with confidential information about the offering on the condition that they not trade the issuer's securities or disclose the confidential information to anyone else before the offering was publicly announced.  In those instances in which Fishoff was not personally brought over the wall by the investment bank, Fishoff obtained the confidential offering information from either Chernin, a close friend and longtime business associate, or Costantin, Fishoff's brother-in-law, who were brought over the wall and then tipped Fishoff about the upcoming offering in

violation of the "wall-crossing" agreements.  In some instances, Fishoff, Chernin, and Costantin

obtained the confidential offering information from an associate of theirs who held himself out as

a portfolio manager for one of the entities controlled by Fishoff and was bought over the wall on

certain offerings ("Associate A").  Thereafter, Fishoff, and in some instances Chernin and

Costantin, shorted the stock through Featherwood or other related accounts they controlled.  In

most instances, Fishoff also tipped Petrello, another friend and longtime business associate, and

Petrello then shorted the same stock through accounts held by Brielle Properties, Inc. ("Brielle")

or Oceanview Properties, Inc. ("Oceanview"), which accounts Petrello controlled.  Fishoff

and/or Petrello then tipped Spera, Petrello's childhood friend and business associate, who shorted

the stocks through his trading entity Joleine.  Spera himself was brought over the wall on one

such offering and after agreeing not to trade the issuer's securities or misuse the confidential

offering information before the offering was publicly announced, he shorted the stock in breach

of that agreement.

4.      In numerous offerings between June 2010 and July 2013, Chernin, Costantin,

Fishoff (and on one occasion, Spera himself), or others like Associate A acting on their behalf,

entered into "wall crossing" agreements in which they agreed to keep confidential the material

non-public information they obtained from the investment banks about the pricing and timing of

the offering and not trade in the issuer's stock in advance of the offering.  Chernin and Costantin

knowingly breached those agreements by immediately tipping Fishoff and, in some instances,

also executing short sales on their own for Featherwood's account or that of Cedar Lane

Enterprises, Inc. ("Cedar Lane"), another entity that Fishoff ultimately controlled.  Fishoff tipped

Petrello about each of the eleven offerings in advance of which Spera also traded after Fishoff or

one of his associates were brought over the wall, and Petrello then shorted those stocks through

either Brielle or Oceanview.  Either Fishoff or Petrello then tipped Spera about each of those eleven offerings, and Spera then shorted those stocks through Joleine.  Spera himself was brought over the wall on one such offering and after agreeing not to trade the issuer's securities or misuse the confidential offering information before the offering was announced, he shorted the stock in breach of that agreement.  Spera made $768,766 in unlawful insider trading profits on these eleven offerings.  During this period, Fishoff wired several hundred thousand dollars from Featherwood to entities associated with or controlled by Chernin and Costantin, and received several hundred thousand dollars from entities controlled by Spera and Petrello.

5.      In addition to violating insider trading laws, Spera also violated Rule 105 of Regulation M in connection with one of the eleven offerings by causing Joleine to purchase shares in the offering after executing short sales in the same stock during the 5-day restricted period preceding the pricing of the offerings.  Because Joleine sold the stocks short during the restricted period, Rule 105 prohibited it from also purchasing shares in the offerings.  Joleine's illegal profits separately attributable to the Rule 105 violation totaled over $118,000.

6.      More recently, Fishoff, Petrello, Chernin, and Spera unlawfully traded in advance of a January 9, 2014 announcement of a lucrative licensing agreement between two pharmaceutical companies, Sangamo BioSciences Inc. ("Sangamo") and Biogen Idec Inc. ("Biogen"), on the basis of material non-public information about the transaction that Associate A received from Insider A, a Sangamo officer and longtime friend of Associate A.  In December 2013, Insider A tipped Associate A about the confidential negotiations between Sangamo and Biogen in violation of a duty of confidentiality that Insider A owed to Sangamo, and Associate A then proceeded to tip Chernin, Costantin, and Fishoff.  In turn, Fishoff tipped Petrello and Spera. Fishoff, Petrello, Chernin, and Spera together made a total of over $1.48 million by purchasing

Sangamo stock and call options before the announcement, after which the market price of Sangamo stock rose by over 38 percent.  Cedar Lane then wired over $222,000 to Associate A for his tips relating to Sangamo, and Spera, who made approximately $287,805 on the Sangamo trading, caused Joleine to wire over $139,000 to one of Fishoff's accounts at about the same time as Cedar Lane's wire.

7.      By virtue of the conduct alleged herein, Spera and Joleine, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Rule 105 of Regulation M under the Exchange Act [17 C.F.R. § 242.105].

8.      Unless Spera and Joleine are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  In addition, the Commission seeks a final judgment (a) permanently enjoining Spera from participating in any way in any future secondary or follow-on offering of common stock; (b) ordering the Defendants to disgorge their ill-gotten gains, together with prejudgment interest thereon, including an order holding the Defendants jointly and severally liable for their ill-gotten gains; and (c) ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) [15 U.S.C. § 78u(d)(3)] and/or 21A of the Exchange Act [15 U.S.C. § 78u-1].

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise to the alleged violations occurred in the District of New Jersey, including allegedly violative trading and the misappropriation and dissemination of material non-public information on the basis of which allegedly violative trading occurred, and Joleine is incorporated in the District of New Jersey.

12.      In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## THE DEFENDANTS

13.      **Spera**, age 56, is the sole owner of Joleine, an entity he controls and uses as a trading vehicle.  Spera resides in Boca Raton, Florida.  Spera and Petrello, who now also resides in Boca Raton, have been close friends since childhood.  Until approximately 2007, Spera was also associated with a day-trading firm based in New York ("Day Trading Firm A").

14.      **Joleine** is a New Jersey corporation owned by Spera and whose business address is Spera's home address.  During all relevant periods, Joleine maintained a prime brokerage account with Prime Broker A, a registered broker-dealer based in southern California.  As

arranged with Prime Broker A, Joleine maintained Delivery-Versus-Payment ("DVP") execution accounts with other brokers, including DVP Broker C, in its own name and in additional names under which it did business ("DBAs"), including Duke Capital.  When the DBAs executed securities transactions in the DVP accounts, the securities ultimately were held or sold by Joleine in (*i.e.*, settled to) its prime brokerage account at Prime Broker A.  Spera did relevant trading in Joleine through DVP account representatives and directly through an online trading platform. Spera had sole trading authority in Joleine's accounts.

## RELEVANT INDIVIDUALS AND RELATED ENTITIES

15.     **Fishoff**, age 60, is president and sole owner of Featherwood.  Fishoff owns or controls a large number of other entities in addition to Featherwood, including JSF Investments, Inc. ("JSF"), Gold Coast Total Return, Inc. ("Gold Coast"), Seaside Capital, Inc. ("Seaside"), Data Complete Inc. ("Data Complete") and Cedar Lane, through which he engages, or directs others to engage, in securities and other financial transactions.  Prior to 2009, Fishoff was also associated with Day Trading Firm A.  In connection with the conduct detailed herein, the Commission previously filed an action against Fishoff and the above related entities that is currently pending before the United States District Court for the District of New Jersey, captioned *SEC v. Steven Fishoff, et al.*, 15-cv-3725 (DNJ)(MAS-DEA) ("*SEC v. Fishoff*").  The United States Attorney's Office for the District of New Jersey also filed a parallel criminal action against Fishoff, captioned *United States v. Steven Fishoff*, 15-cr-586 (DNJ)(MAS), which is also pending.

16.     **Petrello**, age 56, is president and sole owner of Brielle and Oceanview.  During the relevant period, he resided in Brielle, New Jersey, and Boca Raton, Florida, where he currently resides.  During the relevant period, Petrello and Fishoff were close friends who took

family vacations and celebrated holidays together.  Petrello was also associated with Day

Trading Firm A.  In connection with the conduct detailed herein, Petrello was also charged in

*SEC v. Fishoff*.  Petrello has since consented to the entry of a partial final consent judgment

against him and related entities in that case.  Petrello also pled guilty to parallel criminal charges

filed against him by the United States Attorney's Office for the District of New Jersey.  *United*

*States v. Petrello*, 16-cr-69 (DNJ)(MAS).

17.    **Chernin**, age 68, is a disbarred California attorney who was found to have

misappropriated client assets.  He is a close friend and business associate of Fishoff.  Chernin

resides in Oak Park, California, a few miles from Fishoff's home.  Chernin is listed in corporate

documents as president of Gold Coast and Cedar Lane and as an officer of Data Complete.  In

connection with the conduct detailed herein, Chernin was also charged in *SEC v.*

*Fishoff*.  Chernin has since consented to the entry of a partial final consent judgment against him

and related entities in that case.  Chernin also pled guilty to parallel criminal charges filed

against him by the United States Attorney's Office for the District of New Jersey.  *United States*

*v. Chernin,* 16-cr-157 (DNJ)(MAS).

18.    **Costantin**, age 56, is Fishoff's brother-in-law.  Costantin's sister is married to

Fishoff.  Costantin is also a friend and business associate of Chernin.  Costantin resides in

Farmingdale, New Jersey, approximately 11 miles from Petrello's New Jersey home during the

relevant period.  Petrello's wife and Costantin's sister (Fishoff's wife) are friends.  Costantin is

listed in corporate documents as president of Seaside.  In connection with the conduct detailed

herein, Costantin was also charged in *SEC v. Fishoff*.  Costantin has since consented to the entry

of a partial final consent judgment against him and related entities in that case.  Costantin also

pled guilty to parallel criminal charges filed against him by the United States Attorney's Office for the District of New Jersey. *United States v. Costantin*, 16-cr-158 (DNJ)(MAS).

19. **Featherwood** is a California corporation owned by Fishoff and whose business address is Fishoff's home address. Featherwood maintained a prime brokerage account with Prime Broker A. As arranged with Prime Broker A, Featherwood also maintained DVP execution accounts with other brokers in its own name and in as many as 71 additional DBAs. When the DBAs executed securities transactions in the DVP accounts, the securities ultimately were held or sold by Featherwood in (*i.e.*, settled to) its prime brokerage account at Prime Broker A. Featherwood maintained DVP accounts during the relevant period at several registered broker-dealers, including DVP Broker A, DVP Broker B, and DVP Broker C. Fishoff did the bulk of the relevant trading in the Featherwood DVP accounts, and Chernin and Costantin also placed certain trades in the Featherwood DVP accounts. Featherwood is a defendant in *SEC v. Fishoff*.

20. **Gold Coast** is a California corporation with business addresses at Fishoff's home and a strip mall near Chernin's home. Gold Coast corporate documents list Chernin as president and Fishoff as an officer. Gold Coast is one of the Featherwood DBAs and Fishoff identified himself as its owner in Prime Broker A's account documents. Gold Coast is a defendant in *SEC v. Fishoff*.

21. **Brielle** is a Florida corporation with a business address in Boca Raton, Florida. Petrello is the president and sole owner of Brielle, which maintained a prime brokerage account at Prime Broker A. Petrello's former home address in Brielle, New Jersey is listed as Brielle's address on Prime Broker A's account documents. Brielle maintained DVP accounts with multiple brokers in its own name and in the name of numerous DBAs. When those DBAs

9

executed securities transactions, the securities ultimately were held or sold by Brielle in (*i.e.*, settled to) its prime brokerage account at Prime Broker A.  Brielle maintained DVP accounts during the relevant period at DVP Broker A and DVP Broker C.  Petrello is the authorized trader on the Brielle account.  The registered representatives on Brielle's accounts at DVP Broker A and DVP Broker C were also the registered representatives on Featherwood's accounts at those broker-dealers.  Brielle is a defendant in *SEC v. Fishoff*.

22.     **Oceanview** is a New Jersey limited liability company owned by Petrello and registered to his former home address in New Jersey.  Oceanview had a prime brokerage account at Prime Broker A and DVP accounts with other brokers in its own name and in the name of numerous DBAs.  When those DBAs executed securities transactions, the securities ultimately were held or sold by Oceanview in (*i.e.*, settled to) its prime brokerage account at Prime Broker A.  Oceanview held a DVP account at DVP Broker C during the relevant period.  Oceanview is a defendant in *SEC v. Fishoff*.

23.     **Data Complete** is a California corporation with a business address in Woodland Hills, California.  It is one of Featherwood's DBAs, and corporate documents list Chernin as an officer.  Fishoff identified himself as its owner in Prime Broker A's account documents**.**  Data Complete is a defendant in *SEC v. Fishoff*.

24.     **Seaside** is a New York corporation whose business address is Costantin's home address.  It is one of Featherwood's DBAs, and corporate documents list Costantin as president.  Fishoff identified himself as its owner in Prime Broker A's account documents.  Seaside is a defendant in *SEC v. Fishoff*.

25.    **JSF** is a California corporation whose business address is Fishoff's home address. JSF corporate documents list Fishoff as President and Secretary.  JSF maintained a prime brokerage account with Prime Broker A.  JSF is a defendant in *SEC v. Fishoff*.

26.    **Cedar Lane** is a New York corporation whose business address is Chernin's home address.  It was formed in February 2012.  Like Joleine, Featherwood and Brielle, Cedar Lane maintained a prime brokerage account at Prime Broker A and a DVP account at DVP Broker C.  Corporate documents list Chernin as president and Costantin as vice president and secretary of Cedar Lane and also list them as its co-owners.  As reflected in Prime Broker A's account opening documents, Featherwood (through Fishoff) guaranteed Cedar Lane's account at Prime Broker A until at least June 2012.  Cedar Lane is a defendant in *SEC v. Fishoff*.

27.    **Associate A**, age 47, purported to be a health care investment consultant and portfolio manager for Cedar Lane from approximately October 2012 until at least 2015.  He has also had involvement with other trading vehicles controlled by Fishoff.  Associate A resides in New York, New York.

28.    **Insider A**, age 60, served as a Vice President of Clinical Research at Sangamo from January 2010 until at least June 2015.  At Sangamo, Insider A worked on the clinical development of gene and T-cell therapies for the treatment of HIV/AIDS and other diseases. Insider A resides in San Francisco, California.

## RELEVANT ISSUERS

29.    **Aeterna Zentaris, Inc.** ("Aeterna") is a Canadian corporation headquartered in Quebec, Canada.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol AEZS.

30.     **Ampio Pharmaceuticals, Inc.** ("Ampio") is a Delaware corporation headquartered in Greenwood Village, Colorado.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol AMPE.

31.     **Biodel Inc.** ("Biodel") is a Delaware corporation headquartered in Greenwood Village, Colorado.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol BIOD.

32.     **Biogen** is a Delaware corporation headquartered in Cambridge, Massachusetts. At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol BIIB.

33.     **China Metro-Rural Holdings Ltd.** ("China Metro") is a corporation headquartered in the Hong Kong Special Administrative Region, China.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE") under the symbol CNR.

34.     **CPI Aerostructures, Inc.** ("CPI") is a New York corporation headquartered in Edgewood, New York.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE under the symbol CVU.

35.     **Plug Power, Inc.** ("Plug") is a Delaware corporation headquartered in Latham, New York.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol PLUG.

36.    **Puda Coal, Inc.** ("Puda") is a Delaware corporation headquartered in Taiyuan, China.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE under the symbol PUDA.

37.    **Quantum Fuel Systems Technologies Worldwide, Inc.** ("Quantum") is a Delaware corporation headquartered in Irvine, California.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ under the symbol QTWW.

38.    **Sangamo** is a Delaware corporation headquartered in Richmond, California.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol SGMO.

39.    **Solitario Exploration & Royalty Co.** ("Solitario") is a Colorado corporation headquartered in Wheat Ridge, Colorado.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE under the symbol XPL.

40.    **Synergy Pharmaceuticals, Inc.** ("Synergy") is a Delaware corporation headquartered in New York, New York.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol SGYP.

**THE DEFENDANTS' INSIDER TRADING SCHEME**

**Confidentially Marketed Securities Offerings**

41.    Publicly traded issuers have a number of potential ways to raise funds.  One way is through an offering of securities.  Typically in an offering, an issuer offers to sell a set number of new shares at a set price to private investors or to the general public.  The issuer typically

retains one or more investment banking firms that act as middlemen or sales agents.  The
investment banking firms may purchase a set number of shares from the issuer up front and then
try to resell the shares to private or public investors.  An offering that is conducted in this manner
is commonly referred to as being done on a "firm commitment" basis, because the investment
banking firm commits up front to buying a set number of shares from the issuer and then seeks to
resell those shares at its own risk.  An offering in which the investment banking firm does not
commit up front to buying a set number of shares from the issuer but rather buys only as many
shares as the investment banking firm is able to sell to others is commonly referred to as an
offering that is done on a "best efforts" basis.

42.     When an issuer whose securities are already publicly traded conducts an offering
of additional securities, such an offering is commonly referred to as either a secondary or follow-
on offering.  Because there is already a public market for the issuer's securities, an issuer's plans
for a secondary or follow-on offering must be kept in strict confidence until the offering is
publicly announced in order to, among other things, protect the confidentiality of the issuer's
information and comply with federal securities and other laws prohibiting premature or selective
disclosure and requiring implementation of internal policies and procedures to safeguard against
illegal insider trading or other misuse of material non-public information.  Accordingly, when
investment banking firms seek to market a secondary or follow-on offering to potential investors
in advance of the public announcement of the offering, the investment banking firms must obtain
confidentiality agreements from the potential investors before sharing confidential information
about the offering, such as the identity of the issuer, the likely timing and size of the offering and
the anticipated pricing terms.  Before public announcement of the offering, all such information
is considered by the issuer and the investment banking firm to be highly confidential and to be

material non-public information, and the misuse or improper disclosure of such information can result in significant harm to the issuer and the integrity of the securities markets.

43.     The confidentiality agreements described above typically require, among other things, that the potential investor agree to keep confidential, and not disclose to others, the offering information provided by the investment banking firm and refrain from trading the issuer's securities or using the information for any reason other than determining whether to purchase securities in the offering.  The process by which an investment banking firm secures a prospective investor's agreement to keep non-public offering information confidential and, in exchange, provides that information to the prospective investor is commonly known as bringing the prospective investor "over the wall" or "wall-crossing."

44.     There are generally three different types of confidential secondary or follow-on offerings:  so-called "private investment in public equities" or "PIPE" offerings, registered direct offerings, and confidentially marketed public offerings ("CMPOs").  Unlike in PIPE offerings, investors in registered direct offerings and CMPOs receive unrestricted stock, which can be freely transferred and sold in public markets.  A CMPO differs from a registered direct offering in that a CMPO is opened up to public investors after the deal is publicly announced, while a registered direct offering is not opened up to public investors.  Most of the confidential offerings at issue in this case were CMPOs.

**Short Selling Securities**

45.     Short selling or "shorting" a security is the practice of selling a security that the seller does not own, but rather has arranged to borrow from a third party, with the intention of purchasing (also called "covering") the security at a later date.  A short seller profits if the price

of the security declines between the short sale and the cover purchase, because the short seller has sold the security at a price that is greater than the purchase price.

**Overview and Mechanics of the Short-Selling Scheme**

46.     At some point prior to 2009, after Fishoff left Day Trading Firm A, he began day-trading through Featherwood and numerous other vehicles, which included entities nominally headed by Chernin and Costantin.  Petrello did the same with Brielle and Oceanview.  Spera similarly left Day Trading Firm A in 2007, and beginning in 2010 also began day-trading with his own funds through an account held by Joleine.  The insider trading scheme took form in or about 2009 and was carefully structured by Fishoff to enable him and the others to obtain and trade on material non-public information about confidential offerings without being detected.

47.     Fishoff and, under his direction, Chernin and Costantin cultivated contacts at investment banks with the goal of ensuring that they would be on the list of prospective investors contacted to participate in securities offerings of the type described above.  Fishoff, Chernin and Costantin used these contacts to seek out confidential information about, and get brought over the wall on, upcoming follow-on and secondary offerings.  When they were successful in obtaining such information, Fishoff shorted the issuer's stock in advance of the offerings, directed trading by Chernin and Costantin in those instances when he did not place the trades on his own, and tipped Petrello, who then also shorted the stock through Brielle and Oceanview. Beginning in 2010, Petrello (and later Fishoff himself) in turn also tipped Spera, who then shorted the stock through Joleine.

48.     In many instances, the Fishoff-controlled entities for which Chernin and Costantin were fronting also participated in the offering, with the stock going to Featherwood's account and often being used to cover the short sales.  In at least one instance, Spera (through Joleine) did

the same.  The members of the group shared the proceeds of the scheme, with Fishoff wiring money to Chernin and Costantin for their services, and Fishoff receiving payments from Spera and Petrello in exchange for tipping them (directly or indirectly).

**The Deceptive Trading Account Structure**

49.     Fishoff opened Featherwood's prime brokerage account at Prime Broker A in January 2009.  In account opening documents executed by Fishoff, he stated that he is the sole officer and owner of Featherwood.  He also executed DBA attestation forms which confirmed that the account and the listed DBAs, which include Gold Coast, Data Complete and Seaside, belonged to Featherwood and Fishoff.  In the forms, Fishoff stated that he owned the DBAs and confirmed that, despite the numerous DBAs, the Featherwood account was a single account for margin and credit purposes.

50.     Petrello also executed account opening documents and attestations with Prime Broker A acknowledging Petrello's ownership and control of the Brielle and Oceanview accounts and DBAs and that, despite the DBA structure, the Brielle and Oceanview accounts were single accounts for margin and credit purposes.

51.     Spera also executed account opening documents and attestations with Prime Broker A, acknowledging Spera's ownership and control of the Joleine account and DBAs and that, despite the DBA structure, the Joleine account was a single account for margin and credit purposes.

52.     Fishoff, Petrello, and Spera structured their trading accounts to obscure the paper trail connecting them to the trading.  Although Featherwood and other relevant entities that Fishoff controlled, including Cedar Lane, all had prime brokerage accounts at Prime Broker A, they did all their trading away from Prime Broker A.  The trades were executed directly through

at least three noncustodial DVP accounts that were held at other brokerage firms and owned and/or controlled by Fishoff.  Prime Broker A tracked trading by prime brokerage accounts customers like Fishoff through a database called the "trade management system" ("TMS").  Under that system, Fishoff and others who used the DVP accounts, like Chernin and Costantin, could input trades in the TMS.  Prime Broker A then transmitted the trade information to its clearing broker for purposes of settlement, and the trades all settled into the prime brokerage account at Prime Broker A.

53.     The Internet Protocol address and Internet Service Provider information relating to the online trading platforms used to place the trades show that Fishoff personally executed many of the trades at issue in this case in the DVP accounts online from his home, and that Chernin and Costantin also placed relevant trades online from their homes.

54.     Petrello structured his trading in a similar manner, with Brielle and Oceanview holding prime brokerage accounts at Prime Broker A but with the trading being done in Petrello's DVP accounts, principally through an online trading platform accessed from Brielle's office.

55.     Spera also structured his trading in a similar manner, with Joleine holding a prime brokerage account at Prime Broker A but with the trading being done in Spera's DVP accounts, principally through an online trading platform or on an agency basis through DVP Broker C's trading desk.

56.     In many cases, the short sales that Fishoff, Chernin, Petrello, and Spera executed directly through the online platforms were falsely entered by them as sales, rather than short sales, in a further attempt to avoid detection.

**The Systematic Theft of Confidential Offering Information**

57.     The offerings at issue in this case all involve the issuance of additional shares by relatively small (*i.e.*, "midmarket") or thinly traded public companies, and offerings in this and other market segments generally have an adverse impact on the market price when announced because they dilute the holdings of existing shareholders and are sold at a discount to the prevailing market price.

58.     To obtain access to confidential information about upcoming offerings, Chernin and Costantin, and in some instances Fishoff himself, deceptively established relationships with investment banks by separately cold-calling banks and posing as portfolio managers of legitimate investment funds.  For example, Chernin and Costantin separately emailed multiple banks after making scripted cold calls to the banks, including to Investment Bank A, a leader in this segment of the market by deal count, and to Investment Bank B.

59.     Chernin and Costantin both made the same pitch to the banks, falsely presenting themselves as portfolio managers at "firms" with as much as $150 million in assets "under management."  Those so-called "firms" were Gold Coast and Seaside, respectively, and neither Chernin nor Costantin mentioned any connection to Featherwood.

60.     Chernin opened an account for Gold Coast at Investment Bank A in May 2010. The account opening documents, which he signed, list him as president of Gold Coast, give Fishoff's home address as Gold Coast's address and identify Fishoff as an officer of Gold Coast. Costantin opened an account at Investment Bank A for Seaside in February 2011.  The Seaside account opening documents mention only Costantin and give his home address as Seaside's address.  Chernin and Costantin also opened accounts for Gold Coast and Seaside with Investment Bank B.

61.     Fishoff also participated in the charade.  He held himself out in emails as Chernin's "partner" and led bankers at Investment Bank A to believe that he and Chernin were Gold Coast's portfolio managers.  Fishoff and Chernin told Investment Bank A that they were interested in Investment Bank A's entire deal pipeline, without regard to any portfolio management criteria.  None of the bankers in contact with Fishoff and Chernin knew of any relationship between Gold Coast and Featherwood or had even heard of Featherwood.  Nor did those bankers know of any connection between Chernin and Costantin, including the banker who separately brought both of them over the wall on one offering, or between Seaside and Featherwood.

62.     To further the deception, many of the Featherwood DBAs and other entities controlled by Fishoff,  including Featherwood, Gold Coast, Seaside and Cedar Lane, maintained identical, though purportedly unrelated, websites falsely proclaiming, among other things, that they were full service financial management firms involved in "Wealth Management, Private Equity Services, Investment Banking, [and] Real Estate Investments."

63.     As detailed below with respect to specific offerings, Chernin and Costantin, and on occasion Fishoff himself, succeeded in being brought over the wall and obtaining confidential offering information from several investment banking firms, including in the instances described in detail below.  In one instance, Spera was also brought over the wall.  Each time, they each agreed not to disclose the information and not to trade in the issuer's securities before the offering.

64.     As contemplated by their scheme, Chernin, Costantin and Fishoff, and in one instance Spera, knowingly breached these confidentiality agreements.  Chernin and Costantin either tipped Fishoff in breach of the agreements or, where Fishoff was ostensibly within the

scope of the agreements involving Gold Coast, the agreements were breached when Fishoff

traded and tipped Petrello and/or Spera.  In some cases, Chernin, Costantin, and Spera breached

the agreements by placing short sales themselves.

65.     Fishoff knew that the information that he received from Chernin and Costantin

was subject to confidentiality agreements that were breached either by his receipt of the

information or, where the agreements ostensibly permitted disclosure to others within Gold

Coast, by his trading.  In addition to his personal familiarity with wall-crossing procedures and

his intimate involvement in every aspect of the scheme, Fishoff had direct knowledge, through

emails and otherwise, of the wall-crossing agreements in those instances in which he was not

personally brought over the wall.  Since at least late 2010, Chernin and Costantin had their

business emails automatically forwarded to Fishoff's personal email account.  As a result, emails

that investment bankers sent to Chernin and Costantin confirming that they had been brought

over the wall on an offering subject to a confidentiality agreement went instantly to Fishoff

during this period.  In addition to confirming the confidentiality terms and the prohibition on

trading before the offering was announced, these emails typically identified the issuer, the type

of offering and its anticipated timing.  In other instances, Chernin manually forwarded to Fishoff

emails from investment banking firms containing material non-public information about an

offering.  Spera was also familiar with the wall-crossing process, having been brought over the

wall at least once on an offering subject to a confidentiality agreement that was confirmed by

email.

66.     In almost all instances, once Chernin or Costantin were brought over the wall,

they immediately called Fishoff.  After the calls, Fishoff, Chernin or Costantin entered short

sales at the prevailing market price, typically 10-20% above the eventual offering price, and

often covered the short sales with shares received by Featherwood, under the guise of Gold Coast or Seaside, in the offering.  In many instances, Fishoff called Petrello shortly after placing the short sales and Petrello entered short sales shortly after, or during, his phone calls with Fishoff.  Also in many instances, Fishoff tipped Spera directly, or Petrello tipped Spera, either on his own initiative or at the instruction of Fishoff.  Shortly after these tips, Spera placed short sales as well.  In one instance, Spera also directly entered short sales in an issuer's securities after he had been brought over the wall and was subject to a confidentiality agreement with respect to an upcoming offering by that issuer.

### The Profits from the Short-Selling Scheme

67.     Fishoff, Petrello, Chernin, and Costantin engaged in illegal insider trading in advance of at least fourteen dilutive offerings, and Spera engaged in illegal insider trading in advance of at least eleven of those same offerings.  Their trading generated $3, 989,183 in total profits in connection with these offerings, as measured by the difference between the short sale prices and the lower offering prices.  The relevant trading accounts made the following profits: (i) Featherwood - $1,396,951; (ii) Brielle - $1,305,715; (iii) Cedar Lane - $526,241; (iv) Oceanview - $54,509; and (v) Joleine - $768,766.

68.     Fishoff, Petrello, Chernin, Costantin, and Spera shared these profits.  As reflected in numerous "payroll" spreadsheets, Fishoff compensated Chernin and Costantin on a monthly basis based on Featherwood's trading profits, generally splitting the profits between himself and Chernin or Costantin on a 50-50 basis.  Fishoff caused Featherwood to transmit funds directly or indirectly to Chernin and Costantin.  Chernin received some of the funds from Featherwood through an entity he controlled named Morgan Lane, and Costantin received some of the funds from Featherwood through an entity he controlled named Riverside Capital.  These payments

totaled at least several hundred thousand dollars during the relevant period.  Featherwood also wired large sums directly to Costantin's personal accounts, including approximately $1 million or more to one of his personal accounts.

69.     Petrello and Spera compensated Fishoff for the confidential offering information, wiring at least several hundred thousand dollars to Fishoff during the relevant period through the entities that they controlled.

**Examples of the Short-Selling Scheme**

70.     Described below are the key operative facts for each of the eleven offerings in connection with which the Spera and Joleine engaged in illegal insider trading.  The timing, pattern and substance of the relevant communications and trades show that the trading in advance of each of these eleven offerings was based on material, non-public information that was misappropriated in breach of the confidentiality agreement entered into by the party brought over the wall by the investment banking firm.  In addition to other incriminating evidence specific to individual offerings, the following events occurred with respect to each of the eleven offerings:  (1) Fishoff, Chernin, Associate A, Spera and/or Costantin were "wall-crossed" by the issuer's investment bankers and agreed not to disclose the offering information and to refrain from trading; (2) shortly after being "wall-crossed," Chernin, Associate A and/or Costantin communicated with Fishoff by telephone, and often also by email, but before any of the defendants began trading; (3) shortly after communicating with Chernin, Associate A and/or Costantin, Fishoff communicated with Petrello, and Fishoff and/or Petrello communicated with Spera; (4) within days -- and often within hours or even minutes of these communications and on the same day as the wall-crossing -- Fishoff, Chernin and/or Costantin began short selling for the accounts of Featherwood or Cedar Lane, Petrello began short selling for the accounts of Brielle

or Oceanview, and Spera began short selling for his Joleine account, continuing to build their short positions until the last trading day before public disclosure of the offering; and (5) after the public announcement, the relevant entities would cover their positions, often exiting the stock completely within a week or less of the announcement.

**Puda**

71.     In December 2010, Investment Bank B marketed a $94.2 million CMPO for Puda that was priced and publicly announced after the markets closed on December 7, 2010.  The details of the offering, including the share price and offering size, were publicly announced before the market opened on December 8, 2010.  The share price in the offering was $12 per share.

72.     On December 7, 2010, Puda closed at $14.60 per share on volume of 1.4 million shares.  On December 8, 2010, Puda's closing price fell to $12.04 per share, a 17.3% drop, on volume of 8.5 million shares, more than six times higher than the December 7 volume.

73.     Chernin and Gold Coast were brought over the wall on the Puda offering by Investment Bank B, and Gold Coast was allocated 100,000 shares in the offering.  Those shares went into the Featherwood account at Prime Broker A.  Investment Bank B also brought Costantin and Seaside over the wall, and Seaside was allocated 5,000 shares in the offering.  Those shares also went into the Featherwood account at Prime Broker A. Featherwood made $323,271 by selling Puda stock short after Chernin and Costantin were brought over the wall and ahead of the public announcement of the offering, and Brielle made $118,485 by doing the same.  Joleine also shorted the stock and made $14,792.  The misappropriation of the offering information is detailed below.

74.     Using a wall-crossing process similar to that employed by other banks, a banker for Investment Bank B, Investment Banker B-1, brought both Chernin (Gold Coast) and Costantin (Seaside) over the wall on the Puda offering on December 1, 2010.  Chernin was brought over the wall just before 9:24 a.m., and Costantin was brought over the wall a little later that morning, at approximately 9:44 a.m.  Investment Banker B-1 sent an email to another employee of Investment Bank B at 9:24 a.m. on December 1, 2010 stating that the banker had brought Chernin over the wall.  The banker sent the email within minutes of bringing Chernin over the wall.  At the time, the banker did not know of any ties among Chernin, Costantin and Fishoff.

75.     During the calls, Investment Banker B-1, consistent with Investment Bank B policy, read Investment Bank B's required wall-crossing script to Chernin and Costantin separately and obtained their agreement to abstain from disclosure of the offering information to others and from trading in the issuer's securities before the offering was announced.  After obtaining Chernin and Costantin's agreement to these confidentiality terms, the banker disclosed Puda's identity, the general deal size, and its timing.  This information was material and non-public.  The banker then emailed the other employee of Investment Bank B, who sent separate emails to Chernin and Costantin on the morning of December 1, 2020 asking them to confirm their understanding of the "wall crossing" terms.  By 10:35 a.m. on December 1, both Chernin and Costantin had replied by email and confirmed their agreement to the following:

> [N]either you nor your firm will disclose any of the confidential information regarding Puda Coal or the potential offering we or Puda Coal have provided or will provide . . . to anyone within or outside your firm (other than, subject to these restrictions, to those people at your firm actively involved in the investment decision with respect to the potential offering) or engage in market transactions relating to Puda Coal securities or effect any other transaction in such securities until 9:30 am EDT on December 8th, 2010.

76.     Chernin, Costantin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information.  Chernin and Costantin passed the Puda offering information on to Fishoff, who then sold Puda stock short and tipped Petrello about the Puda offering.  After Fishoff's tip, Petrello also shorted Puda stock and passed the confidential Puda offering information on to Spera, who then also shorted the stock.  These communications and trades all occurred after Investment Bank B brought Chernin and Costantin over the wall on the Puda offering and before the offering was publicly announced.

77.     Chernin and Costantin discussed the Puda offering with Fishoff and with each other immediately after being brought over the wall on December 1, 2010, and Fishoff started shorting Puda a few days later.  On December 1 at 9:23 a.m., Chernin -- right after being brought over the wall -- placed a four-minute call to Fishoff.  At 9:31 a.m., Costantin called a phone number at Investment Bank B and then placed an 11-minute call to Chernin from a different line at 9:33 a.m.  According to a 9:41 a.m. email from Investment Bank B, Costantin had called Investment Bank B to say that he "heard a rumor [Investment Bank B was] in the market with something" and wanted a call.  At 9:44 a.m., Costantin received a call from Investment Bank B which lasted six-and-a-half minutes and in which Investment Banker B-1 brought Costantin over the wall on the Puda offering.  Costantin then immediately called Fishoff and Chernin, at 9:51 a.m. and 9:54 a.m., respectively.

78.     In addition to the telephone conversations described above, Fishoff also received confidential information about the Puda offering from Costantin by email.  Beginning no later than October 2010, all emails sent to Costantin's Seaside email address were automatically forwarded to Fishoff's email address.  As a result, Fishoff received the email that Investment Bank B sent to Costantin on the morning of December 1, 2010 containing confidential

information about the Puda offering and confirming the prohibitions on disclosure, trading and other use of the information to which Costantin had agreed.

79.     As the Puda offering came to fruition over the next few days, Chernin and Costantin continued to communicate with Fishoff by telephone and email about the Puda offering in violation of the confidentiality agreements with Investment Bank B.  For example, Chernin manually forwarded a highly confidential email about Puda from Investment Banker B-1 to Fishoff on December 5, 2010, the same day that Chernin received it.  The email said:

> Can you let me know what you are thinking for Puda? We are pricing Tuesday for Wednesday (you'll have free trade pre-open Wednesday [December 8]).  Book is super solid, pricing is being worked on, but will be quite attractive at a substantial discount from current levels.  Let me know, I'll do my best to get you what you indicate.

80.     On December 6, 2010, Fishoff began shorting Puda stock in his Featherwood accounts, which had never previously traded Puda, and built a 103,000 share short position at an average sale price of $15.13 per share before the offering was announced.  Chernin and Costantin disclosed the confidential Puda offering information that they had received from Investment Bank B to Fishoff during one or more of their conversations with Fishoff that occurred before Fishoff's first short sale in Puda on December 6, 2010, and by email as well. Featherwood covered its short position at a profit after the public announcement of the $12 per share offering price and exited Puda completely by December 15, 2010.

81.     Pursuant to the scheme, Fishoff tipped Petrello about the Puda offering, and Petrello then traded on the basis of that information before the offering was publicly announced. On December 1, 2010 at 9:26 a.m., just as the call that Chernin placed to Fishoff after being brought over the wall ended, Fishoff placed a fourteen-minute call to Petrello.  On December 6 and 7, 2010, Petrello caused Brielle to sell short a total of 29,500 shares through its DVP accounts at an average sale price of $15.19 per share, which were Brielle's first trades in Puda

since February 2010.  Fishoff disclosed confidential Puda offering information that he had received from Chernin and Costantin to Petrello during one or more conversations between Fishoff and Petrello that occurred before Petrello's first short sale in Puda on December 6, 2010. Brielle covered its short position at a profit on December 8, 2010, after the public announcement of the Puda offering price of $12 per share.

82.     Petrello in turn tipped Spera about the Puda offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced. Between December 1 (the day of Fishoff's tip to Petrello) and December 7, Petrello and Spera exchanged numerous calls.  On December 7, 2010, beginning at 10:15 a.m., brokers at DVP Broker C sold short 29,900 shares of Puda, of which 5,000 shares were allocated to Joleine at an average price of $14.95.  Petrello disclosed confidential Puda offering information that he had received from Fishoff to Spera during one or more conversations between Petrello and Spera that occurred before Joleine's first short sale in Puda on December 7.  Spera covered Joleine's short position at a profit, and exited Puda completely, after the public announcement.

**Quantum**

83.     In February 2011, Investment Bank A marketed a $7.7 million PIPE offering for Quantum that was priced and publicly announced after the market closed on February 16, 2011. The details of the offering, including the share price and offering size, were publicly announced before the market opened on February 17, 2011.  The share price in the offering was $5.07 per share.

84.     On February 16, 2011, Quantum's stock closed at $5.97 per share on volume of 162,000 shares.  On February 17, 2011, Quantum's closing price fell to $5.12 per share, a 14% decline, on volume of 972,099 shares, more than six times higher than the February 16 volume.

85.     Chernin and Gold Coast were brought over the wall on the Quantum offering by Investment Bank A but did not purchase any shares in the offering.  Because the Quantum offering was a PIPE offering and was not conducted pursuant to a registration statement, purchasers of offering shares received restricted stock that they would need to register at their own expense or hold for six months before it could be transferred.  As such, unregistered Quantum offering shares could not be used to cover short sales prior to the expiration of the six-month holding period and were therefore of no value to the defendants' scheme.

86.     Featherwood made $105,362 by selling Quantum stock short after Chernin was brought over the wall and ahead of the public announcement of the Quantum offering, and Brielle and Joleine made $110,342 and $53,015, respectively, by doing the same.  Neither entity had previously traded Quantum securities.  The misappropriation of the offering information is detailed below.

87.     Using a the standard procedure at Investment Bank A, Investment Banker A-1 brought Chernin and Gold Coast over the wall during an eleven-minute phone call placed on January 31, 2011 at 2:39 p.m. by Chernin to the banker.  Pursuant to Investment Bank A's policy, Investment Banker A-1 secured Chernin's agreement to keep all information relating to the offering confidential and then provided Chernin with confidential information relating to the offering, including Quantum's identity and the anticipated pricing and timing of the offering. This information was material and non-public.

88.     Pursuant to Investment Bank A's policy, Investment Banker A-1 executed an attestation form (erroneously dated January 30, 2011) which memorialized the fact that Chernin was brought over the wall on the Quantum offering and the confidentiality terms to which Chernin had agreed.  The form stated that Chernin had agreed, on behalf of Gold Coast, that (i)

the offering information he received was "highly confidential" and would be kept "in confidence;" (ii) he would use the information "only for the purpose of evaluating whether you/your institution will acquire the securities in this offering;" (iii) he would not "disclose any such information (including the existence of the potential offering) to any third party;" and (iv) neither he, nor his "institution," nor their "respective representatives will transact in the securities of the Issuer until such time as the potential offering has been publicly announced."  In the form, the banker attested that he had read the foregoing restrictions to Chernin and that Chernin had agreed, on behalf of Gold Coast, to be bound by the restrictions.  Those restrictions applied with equal force to Fishoff, who held himself out as, and was, Chernin's business partner in Gold Coast.  Consistent with Investment Bank A policy, a different employee of Investment Bank A sent an email to Chernin at his Gold Coast email address confirming that Chernin and Gold Coast had agreed to the confidentiality restrictions regarding the issuer's name, the proposed transaction, and the timing and terms of the transaction and had also agreed not to transact in the issuer's securities.  Those restrictions applied with equal force to Fishoff, who held himself out as, and was, Chernin's business partner in Gold Coast.

89.     Chernin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information.  Chernin passed the Quantum offering information on to Fishoff, who also discussed the Quantum offering directly with Investment Banker A-1. Fishoff then sold Quantum stock short and tipped Petrello about the Quantum offering.  After Fishoff's tip, Petrello also shorted Quantum stock and passed the confidential Quantum offering information on to Spera, who then also shorted the stock.  Chernin also shorted Quantum stock after tipping Fishoff.  These communications and trades all occurred after Investment Bank A

brought Chernin over the wall on the Quantum offering and before the offering was publicly announced.

90.     Chernin discussed the Quantum offering with Fishoff shortly after being brought over the wall on the afternoon of January 31, 2011.  Chernin called Fishoff at 3:54 p.m. that day for 14 minutes and exchanged several more phone calls with Fishoff later that day.  Chernin also spoke to Costantin for 14 minutes at 2:54 that afternoon, just minutes after being brought over the wall.

91.     Chernin continued to discuss the Quantum offering with Fishoff and Costantin, including on the day that Fishoff and Chernin began shorting Quantum through Featherwood.  At 9:27 a.m. on February 10, 2011, Chernin called Fishoff for two minutes and then, at 9:31 a.m., spoke to Costantin for nine minutes.  A few minutes later, at 9:46 a.m., an order was entered, and attributed to Fishoff, in one of Featherwood's DVP accounts to sell 10,000 shares of Quantum stock at the market price.  Ten minutes later, at 9:56 a.m., Chernin called Costantin for one minute and then immediately (at 9:57 a.m.) called Investment Banker A-1 for four minutes.  Two minutes after Chernin got off the phone with Investment Banker A-1 (at 10:03 a.m.), Chernin executed a 500 share short sale of Quantum stock online in a Featherwood DVP account. Fishoff himself also spoke to Investment Banker A-1 at 10:14 that morning.

92.     In addition to the telephone conversations described above, Fishoff also received confidential information about the Quantum offering from Chernin by email.  Beginning no later than December 16, 2010, all emails that were sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address.  As a result, Fishoff received, at the time it was sent, the email (described above) that Investment Bank A sent to Chernin containing confidential information about the Quantum offering and confirming the prohibitions on

disclosure, trading and other use of the information to which Chernin had agreed on behalf of Gold Coast.

93.     Fishoff and Chernin continued to short Quantum stock through Featherwood before the offering and its terms were announced.  From February 14 through 8:30 a.m. on February 17 (before the pricing and other details of the Quantum offering were announced that day), Fishoff sold short a total of 71,183 shares of Quantum stock online in Featherwood DVP accounts.  Fishoff's first Quantum short sale on February 14 came at 10:11 a.m., just minutes after Fishoff concluded a six-minute call that he received from Investment Banker A-1 at 9:53 a.m.  Chernin also placed additional Quantum short sales online in a Featherwood DVP account on February 14.  In all, Chernin sold 9,500 Quantum shares short in Featherwood accounts after being brought over the wall on the Quantum offering.  As a result of the short sales placed by Fishoff and Chernin before the offering was announced, Featherwood accumulated a total open short position in Quantum of 71,083 shares at an average sale price of $6.57 per share when the offering was announced.  Chernin disclosed the confidential Quantum offering information that he had received from Investment Bank A to Fishoff and Costantin during one or more of their conversations that occurred before Featherwood's first short sale in Quantum on February 10, 2011.  Fishoff covered Featherwood's 71,083 share short position at a profit, and exited Quantum completely, after the public announcement of the $5.07 per share offering price on February 17, 2011.

94.     Investment Bank A had kept Chernin and Fishoff apprised of the progress and status of the Quantum offering throughout the period leading to the public announcement of the offering.  For example, on February 15, 2011 at 5:33 p.m., Investment Banker A-1 emailed Chernin to inform him that the offering could "come tonight" or "tomorrow."  The banker also

informed a trader for Investment Bank A by email that the trader could "share any detail on Q[uantum] with Ron [Chernin]. He's otw." Investment Banker A-1 also called Fishoff on multiple occasions on the days leading up to the offering announcement.

95.     Pursuant to the scheme, Fishoff tipped Petrello about the Quantum offering, and Petrello then traded on the basis of that information in Brielle DVP accounts before the offering was publicly announced. On the morning of February 1, 2011 -- the day after Investment Bank A brought Chernin over the wall on the offering -- Fishoff called Petrello for three minutes. Fishoff and Petrello exchanged another 43 calls between then and February 10, 2011. On February 11, 2011, Brielle started selling Quantum stock short. Petrello continued shorting Quantum in Brielle accounts through February 16, 2011, and built a total net short position in Quantum of 94,105 shares at an average sale price of $6.24 per share before the offering was publicly announced. Fishoff disclosed confidential Quantum offering information that he had received from Chernin and Investment Banker A-1 to Petrello during one or more conversations between Fishoff and Petrello that occurred before Brielle's first short sale in Quantum on February 11, 2011. Petrello covered Brielle's short position at a profit, and exited Quantum completely, after public announcement of the $5.07 per share offering price on February 17, 2011.

96.     Petrello in turn tipped Spera about the Quantum offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced. Between February 1, 2011 (the day of Fishoff's tip to Petrello) and February 14, Petrello and Spera exchanged numerous calls. Beginning on February 14, 2011 and continuing through February 16, brokers at DVP Broker C sold short 50,000 shares in Joleine's account at an average price of $6.13. Petrello disclosed confidential Quantum offering information that he

had received from Fishoff to Spera during one or more conversations between Petrello and Spera that occurred before Joleine's first short sale in Quantum on February 14.  Spera covered Joleine's short position at a profit, and exited Quantum completely, after the public announcement.

**Solitario**

97.     In March and April 2011, Investment Bank A marketed a $7.8 million CMPO for Solitario that was priced and publicly announced after the market closed on April 12, 2011.  On April 13, 2011, before the market opened, Solitario publicly announced the details of the offering, including the share price and offering size.  The share price in the offering was $2.50 per share.

98.     On April 12, 2011, Solitario opened and closed at $3.07 on volume of 744,099.  On April 13, 2011, the Solitario closing share price fell to $2.76, a 10% drop from the prior day's closing price and a 21% decline from the April 11 opening price of $3.51, on volume of 2.46 million shares, more than three times higher than the April 12 volume.

99.     Chernin and Gold Coast were brought over the wall by Investment Bank A on the Solitario offering, and Gold Coast was allocated 175,000 shares in the offering.  Those shares went into the Featherwood account at Prime Broker A.  Featherwood made $164,516 by selling Solitario stock short after Chernin was brought over the wall and ahead of the public announcement of the offering, and Brielle and Joleine made $172,047 and $81,676, respectively, by doing the same.  None of the entities had previously traded Solitario securities.  The misappropriation of the offering information is detailed below.

100.     The same banker, Investment Banker A-1, that brought Chernin over the wall on the Quantum offering followed the same procedure on Solitario.  Investment Banker A-1 brought

Chernin and Gold Coast over the wall during an eight-minute phone call placed on March 28, 2011 at 3:29 p.m. by the banker to Chernin.  Pursuant to Investment Bank A's policy, the banker secured Chernin's agreement to keep all information relating to the offering confidential and then provided Chernin with confidential information about the offering, including Solitario's identity and the anticipated pricing and timing of the offering.  This information was material and non-public.

101.    Pursuant to Investment Bank A's policy, Investment Banker A-1 executed an attestation form one minute after the wall-crossing call ended, at 3:38 p.m. on March 28, 2011. His attestation form memorialized the fact that Chernin was brought over the wall on the Solitario offering a few minutes earlier and the confidentiality terms to which Chernin had agreed on behalf of Gold Coast.  The confidentiality provisions recited in the Solitario attestation form were identical to the confidentiality provisions, and contained the same attestations by the banker confirming Chernin's agreement to those terms on behalf of Gold Coast, that are described above in the section relating to the Quantum offering.  Consistent with Investment Bank A policy, another employee of Investment Bank A sent an email to Chernin at his Gold Coast email address later that same day confirming that Chernin and Gold Coast had agreed to confidentiality restrictions regarding the issuer's name, the proposed transaction, and the timing and terms of the transaction and had also agreed not to transact in the issuer's securities.  Those restrictions applied with equal force to Fishoff, who held himself out as, and was, Chernin's business partner in Gold Coast.

102.    Chernin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information.  Chernin passed the Solitario offering information on to Fishoff, who subsequently also discussed the Solitario offering directly with Investment

Banker A-1.  Both Chernin and Fishoff also discussed the offering with Solitario's management. After Fishoff learned of the offering, Fishoff sold Solitario stock short and tipped Petrello about the Solitario offering.  After Fishoff's tip, Petrello also shorted Solitario stock and passed the confidential Solitario offering information on to Spera, who then also shorted the stock.  Chernin also shorted Solitario stock after tipping Fishoff.  These communications and trades all occurred after Investment Bank A brought Chernin over the wall on the Solitario offering and before the offering was publicly announced.

103.    Chernin discussed the Solitario offering with Fishoff immediately after being brought over the wall on the afternoon of March 28, 2011.  Chernin called Fishoff for two minutes at 3:36 p.m. that day, just as Chernin's call with Investment Banker A-1 was ending. Three minutes after Chernin's March 28, 2011 call with Fishoff ended (at 3:41 p.m.), Chernin began executing short sales in Solitario online in a Featherwood DVP account.  Fishoff also began executing short sales in Solitario online in a Featherwood DVP account at or about 2:41 p.m. on the following day, March 29, 2011.

104.    In addition to the telephone conversations described above, Fishoff also received confidential information about the Solitario offering from Chernin by email before Fishoff began shorting Solitario.  As described above, all emails sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address beginning no later than December 16, 2010.  As a result, Fishoff received, at the time it was sent, the email that Investment Bank A sent to Chernin on March 28, 2011 containing confidential information about the Solitario offering and confirming the prohibitions on disclosure, trading and other use of the information to which Chernin had agreed on behalf of Gold Coast.

105.    Fishoff and Chernin continued to short Solitario stock through Featherwood before the offering and its terms were publicly announced.  By the time the Solitario offering was publicly announced, Chernin had executed short sales totaling 30,000 Solitario shares and Fishoff had executed short sales totaling over 200,000 Solitario shares in Featherwood accounts after Chernin was brought over the wall on the Solitario offering by Investment Bank A.  As a result of the short sales executed by Fishoff and Chernin, Featherwood accumulated an open short position in Solitario of 208,189 shares at an average sale price of $3.32 per share when the offering was announced.  Chernin disclosed the confidential Solitario offering information that he had received from Investment Bank A to Fishoff during one or more of their conversations that occurred before Fishoff's first short sale in Solitario on March 29, 2011.  Using the 175,000 shares that Gold Coast had received in the offering, Fishoff covered Featherwood's 208,189 share short position at a profit, and exited Solitario completely, after the public announcement of the $2.50 per share offering price on April 13, 2011.

106.    Pursuant to the scheme, Fishoff tipped Petrello about the Solitario offering, and Petrello then traded on the basis of that information in Brielle DVP accounts before the offering was publicly announced.  On March 28, 2011, Fishoff called Petrello for four minutes at 4:09 p.m., about 30 minutes after (i) Chernin was brought over the wall; (ii) Fishoff's subsequent call with Chernin; and (iii) Chernin's first Solitario short sale.  Fishoff called Petrello again for five minutes at 4:23 p.m. that day.  At 1:47 p.m. on the next day, March 29, 2011, Petrello also began shorting Solitario stock on line in a Brielle DVP account.  Petrello continued shorting Solitario in Brielle accounts, and Brielle held a 246,342 share open short position in Solitario at an average sale price of $3.23 per share when the offering was announced after the close of trading on April 12, 2011.  Fishoff disclosed confidential Solitario offering information that he had received from

Chernin to Petrello during one or more conversations between Fishoff and Petrello that occurred before Brielle's first short sale in Solitario on March 29, 2011. Petrello covered Brielle's short position at a profit, and exited Solitario completely, after the public announcement of the $2.50 per share offering price on April 13, 2011.

107.    Petrello in turn tipped Spera about the Solitario offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced. Between March 31 (a few days after Fishoff's tip to Petrello) and April 11, 2011, Petrello and Spera exchanged multiple calls. On April 11 and 12, 2011, Joleine built a net short position of 160,000 shares sold at an average price of $3.0105. Of those short sales, Spera shorted 50,000 shares directly through his online account at DVP Broker C, beginning shortly after a 34-minute call with Petrello on April 12. Petrello disclosed confidential Solitario offering information that he had received from Fishoff to Spera during one or more conversations between Petrello and Spera that occurred before Joleine's first short sale in Solitario on April 11, 2011, and again on April 12. Spera covered Joleine's short position at a profit, and exited Solitario completely, after the public announcement.

108.    Fishoff also communicated with Investment Banker A-1 about the Solitario offering before it was announced, falsely posing as a Gold Coast portfolio manager interested in a long term investment, and both Fishoff and Chernin also obtained confidential information directly from Solitario under the guise of seeking to invest in the company. For example, Investment Banker A-1 notified his supervisors on April 12, 2011 of Fishoff and Chernin's phony indication of interest in the offering an email stating as follows: "Stephen [sic] Fishoff and Ron Chernin of Gold Coast would like to indicate for the [Solitario] transaction. Their interest is as follows: 350,000 shares at $2.00[;] 275,000 shares at $2.25[.] They did have a conference call

with management on this deal and believe it to be a good long term investment." The statements that Fishoff and Chernin made to Investment Bank A and Solitario about their purported interest in making a long term investment in Solitario were materially false and misleading, as Fishoff and Chernin sought to obtain information about the Solitario offering for the sole purpose of misappropriating that information by selling Solitario stock short and tipping others in advance of the offering.

**China Metro**

109.    From March through May of 2011, Investment Bank C marketed a $4.37 million CMPO for China Metro that was priced and publicly announced after the market closed on May 5, 2011. The China Metro offering involved the sale of units consisting of shares and warrants and the details of the offering, including the unit price and offering size, were publicly announced before the market opened on May 6, 2011. The unit price in the offering was $2.88 per unit. Each unit consisted of one share of stock and a warrant to purchase .65 shares at $3.456 per share.

110.    On May 5, 2011, China Metro closed at $3.32 on volume of 63,505 shares. On May 6, 2011, China Metro closed at $2.32, a 30% drop, on volume of 546,745 shares, more than eight times higher than the May 5 volume.

111.    Chernin and Costantin were both brought over the wall by Investment Bank C on the China Metro offering, with Chernin using Data Complete as the Featherwood DBA on this transaction and Costantin using Seaside. Data Complete was allocated 275,000 units in the offering -- 17% of the entire offering -- and those units went into the Featherwood account at Prime Broker A. Featherwood made $198,052 by selling China Metro stock short after Chernin and Costantin were brought over the wall and ahead of the public announcement of the offering,

and Brielle made $98,327 by doing the same.  Neither entity had ever traded China Metro

securities before March 31, 2011, when Costantin was brought over the wall on the offering.

Joleine made $49,866 by selling the stock short after Chernin and Costantin were brought over

the wall.  The misappropriation of the offering information is detailed below.

      112.    Using a wall-crossing procedure similar to the procedures employed by

Investment Bank A and Investment Bank B, a banker at Investment Bank C, Investment Banker

C-1, brought Costantin over the wall on the China Metro offering at or about 3:10 p.m. on March

31, 2011.  Investment Banker C-1 called Costantin at 3:08 p.m. and 3:10 p.m. that day, and the

banker sent an email at 3:15 p.m. to a compliance officer of Investment Bank C stating that he

had brought "Steve" of Seaside "over the wall on [China Metro]."  During their call, Investment

Banker C-1, consistent with Investment Bank C's policy, obtained Costantin's agreement on

behalf of Seaside to abstain from disclosure of the offering information to others and from

trading in the issuer's securities before the offering was announced.  After obtaining Costantin's

agreement to these confidentiality terms, Investment Banker C-1 disclosed China Metro's

identity, the general deal size, and its timing.  This information was material and non-public.  At

3:16 p.m., one minute after receiving the banker's email, the compliance officer sent an email

confirming the terms of the confidentiality agreement to Costantin at his Seaside email address.

The email stated as follows:

        This is to confirm your conversation with [Investment Banker C-1] on March 31,
        2011, in which he received permission from you to communicate to you
        "Confidential Information" . . . concerning a proposed transaction by [China
        Metro].  Our disclosure included (i) the Issuer's name and (ii) the existence of a
        proposed transaction by the Issuer. . . .  The existence of the proposed transaction
        by [China Metro] is highly confidential and may constitute material non-public
        information within the meaning of Regulation FD. . . .  Your firm has agreed to
        maintain in confidence the Confidential Information, and further agreed to use the
        disclosed information only for the purpose of evaluating the proposed transaction
        . . . .  You and any other representatives of your firm to whom the Confidential

Information has been disclosed further agreed not to transact in the securities of [China Metro] until such time as the Master Acknowledgement Agreement ceased to apply . . . or . . . public[] announce[ment].

113.    As described above in paragraph, all emails sent to Costantin's Seaside email address were automatically forwarded to Fishoff's email address beginning no later than October 2010.  As a result, Fishoff received, at the time it was sent, the above email that Investment Bank C sent to Costantin on March 31, 2011 containing confidential information about the China Metro offering and confirming the prohibitions on disclosure, trading and other use of the information to which Costantin had agreed.

114.    In addition to transmitting confidential information about the China Metro offering to Fishoff through this email, Costantin also discussed the China Metro offering with Fishoff and Chernin over the telephone, both of whom then also discussed it with each other.  As soon as Costantin was brought over the wall, Costantin, Fishoff and Chernin were in constant telephonic contact.  Costantin called both Fishoff and Chernin right after his call at 3:10 p.m. on March 31, 2011 with Investment Banker C-1 and numerous additional calls were exchanged among the three of them later in the day, including a five-minute call from Costantin to Fishoff right after Costantin concluded a five-minute call with Investment Banker C-1 at 5:12 p.m.

115.    On April 5, 2011, Chernin called another person that he knew at Investment Bank C, Investment Banker C-2, and specifically asked to be brought over the wall on the China Metro offering.  Chernin placed that call at 11:08 a.m. that morning.  At 12:59 p.m., Investment Banker C-2 sent Chernin an email whose subject line was "Over-the-wall" and which stated as follows: "Ron, I just wanted to confirm that your account value is $150,000,000 [a]nd that you want to come 'over-the-wall' on the deal you asked about."  At 1:10 p.m., Chernin replied to Investment Banker C-2 by email, "Confirmed."  Investment Banker C-2 then emailed Chernin's contact

information to a compliance officer of Investment Bank C and asked the compliance officer to bring Chernin over the wall on the China Metro offering. The compliance officer then sent an email to Chernin at his Gold Coast email address confirming the terms of the confidentiality agreement. That email recited the same prohibitions on disclosure, trading and other use of the confidential China Metro offering information that were contained in the confirmatory email that Investment Bank C sent to Costantin on March 31, 2011, as described above. At 1:37 p.m. on April 5, 2011, Chernin responded to the compliance officer's email by stating in an email that "I agree to the terms and Conditions as set forth." Although Investment Bank C used Chernin's Gold Coast email address to communicate with him about the China Metro offering, Chernin was brought over the wall on behalf of Data Complete, another Featherwood DBA.

116. The emails that Investment Bank C sent to Chernin about the China Metro offering were also received by Fishoff. Beginning no later than December 16, 2010, all emails sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address. As a result, Fishoff received, at the time it was sent, the above email that Investment Bank C sent to Chernin on April 5, 2011 containing confidential information about the China Metro offering and confirming the prohibitions on disclosure, trading and other use of the information to which Chernin had agreed.

117. Costantin, Chernin and Fishoff knowingly violated the two confidentiality agreements with Investment Bank C and misappropriated the offering information. As described above, Costantin passed confidential China Metro offering information on to Fishoff and Chernin, and Chernin and Fishoff also exchanged confidential China Metro offering information with each other. Both Fishoff and Chernin then sold China Metro stock short. In addition, Fishoff tipped Petrello about the China Metro offering. After Fishoff's tip, Petrello also shorted

China Metro stock and passed the confidential China Metro offering information on to Spera, who then also shorted the stock.  As described above and further detailed below, the relevant communications and trades all occurred after Investment Bank C brought Costantin over the wall, and some of them also occurred after Investment Bank C brought Chernin over the wall, on the China Metro offering and before the offering was publicly announced.

118.    From April 1, 2011 -- the day after Costantin was brought over the wall -- through May 5, 2011, Fishoff sold short a total of 390,935 shares of China Metro online in a Featherwood DVP account.  Costantin and Chernin disclosed the confidential China Metro offering information that they had received from Investment Bank C to Fishoff during one or more of their conversations with Fishoff that occurred before Fishoff's first short sale in China Metro on April 1, 2011.  From April 8, 2011 -- three days after Chernin was brought over the wall -- though April 26, 2011, Chernin sold short a total of 21,000 shares of China Metro online in a Featherwood DVP account.  As a result of the short sales executed by Fishoff and Chernin, Featherwood held an open short position in China Metro of 168,967 shares at an average sale price of $3.98 per share when the offering was announced after the close of trading on May 5, 2011.  Using the China Metro shares that came with the 275,000 units that Data Complete had received in the offering, Fishoff covered Featherwood's 168,967 share short position at a profit, and exited China Metro completely, after the public announcement of the $2.88 unit offering price on May 6, 2011.

119.    Some of Fishoff's China Metro short sales came very shortly after Fishoff spoke directly to Investment Banker C-1, who brought Costantin over the wall, and Investment Banker C-2, who brought Chernin over the wall.  On April 18, 2011 at 1:06 p.m. -- after having already received the emails memorializing the confidentiality restrictions applicable to the offering

information -- Fishoff had four-minute phone call with Investment Banker C-2 and at 2:16 p.m., Fishoff sold short 10,000 China Metro shares in a Featherwood account.  On May 5, 2011 at 12:21 p.m., Investment Banker C-1 held an eleven-minute conference call with both Chernin and Fishoff.  At 1:11 p.m. that day, Fishoff sold short 20,000 China Metro shares in a Featherwood account.  The offering was not announced until after the close of trading that day.

120.    Pursuant to the scheme, Fishoff also tipped Petrello about the China Metro offering, and Petrello then traded on the basis of that information in Brielle DVP accounts before the offering was publicly announced.  On April 1, 2011 at 10:38 a.m. -- the day after Costantin was brought over the wall and tipped Fishoff about the offering -- Fishoff placed a nineteen minute call to Petrello.  During that call, the broker for DVP Broker C on both the Featherwood and Brielle accounts entered a 6,000 share China Metro short sale in Brielle's account on an agency basis that was executed at an average sale price of $5.17 per share.  Also during that call, Fishoff entered a 5,000 share short sale order in a Featherwood account.

121.    Between April 4 and May 5, 2011, Petrello sold short another 134,390 China Metro shares online in Brielle's DVP account at that same brokerage firm.  Brielle held an 89,664 share open short position in China Metro at an average sale price of $3.86 per share when the offering was announced after the close of trading on May 5, 2011.  Fishoff disclosed confidential China Metro offering information that he had received from Costantin to Petrello before Brielle's first short sale in China Metro on April 1, 2011.  Petrello covered Brielle's short position at a profit, and exited China Metro completely, after the public announcement of the $2.88 unit offering price on May 6, 2011.

122.    Petrello in turn tipped Spera about the China Metro offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was

publicly announced.  Between April 1 (the day of Fishoff's tip to Petrello) and April 12, 2011,
Petrello and Spera exchanged numerous calls.  On April 12, 2011, a broker for DVP Broker C
entered a 5,000 share China Metro short sale in Joleine's account.  Between April 21 and May 3,
Joleine built a total net short position in China Metro of 45,000 shares at an average price of
$3.85 before the announcement on May 6.  Petrello disclosed confidential China Metro offering
information that he had received from Fishoff to Spera during one or more conversations
between Petrello and Spera that occurred before Joleine's first short sale in China Metro on April
12, 2011.  Spera covered Joleine's short position at a profit, and exited China Metro completely,
after the public announcement.

### The First Plug Offering

123.     In May 2011, Investment Bank A marketed a $20 million CMPO for Plug that
was priced and publicly announced after the market closed on May 24, 2011.  This Plug offering
involved the sale of units consisting of shares and warrants and the details of the offering,
including the unit price and offering size, were publicly announced before the market opened on
May 25, 2011.  The unit price in the offering was $2.42 per unit.  Each unit consisted of one
share of stock and a warrant to purchase additional shares at $3.00 per share.

124.     On May 24, 2011, Plug's market price closed at $2.85 per share on volume of
716,143 shares.  On May 25, 2011, Plug's closing price fell to $2.40 per share, 15.8% decline, on
volume of 2.92 million shares, more than four times higher than the May 24 volume.

125.     Costantin and Seaside were brought over the wall by Investment Bank A on this
Plug offering, but Seaside did not receive an allocation in the offering.  Instead, Gold Coast,
which was not brought over the wall, received 200,000 units in the offering and those units went
into the Featherwood account at Prime Broker A.  Featherwood made $190,062 by selling Plug

stock short after Costantin was brought over the wall and ahead of the public announcement of the offering, and Brielle and Joleine made $238,522 and $152,676, respectively, by doing the same.  None of the entities had previously traded Plug securities.  The misappropriation of the offering information is detailed below.

126.    The banker, Investment Banker A-2, that brought Costantin over the wall on this Plug offering followed the same procedure that Investment Banker A-1 had followed on the Quantum and Solitario offerings described above.  Investment Banker A-2 brought Costantin and Seaside over the wall on the morning of May 11, 2011.  Pursuant to Investment Bank A's policy, the banker secured Costantin's agreement to keep all information relating to the offering confidential and then provided Costantin with confidential information about the offering, including Plug's identity and the anticipated pricing and timing of the offering.  This information was material and non-public.

127.    Pursuant to Investment Bank A's policy, Investment Banker A-2 executed an attestation form right after bringing Costantin over the wall, at 11:10 a.m. on May 11, 2011.  The banker's attestation form memorialized the fact that Costantin had just been brought over the wall on the Plug offering and the confidentiality terms to which Costantin had agreed on behalf of Seaside.  The confidentiality provisions recited in the Plug attestation form were identical to the confidentiality provisions, and contained the same attestations by the banker confirming agreement to those terms, that are described above in the sections relating to the Quantum and Solitario offerings.  Consistent with Investment Bank A policy, another employee of Investment Bank A sent an email to Costantin at his Seaside email address later that same day, at 2:33 p.m., confirming that Costantin and Seaside had agreed to confidentiality restrictions regarding the

46

issuer's name, the proposed transaction, and the timing and terms of the transaction and had also agreed not to transact in the issuer's securities.

128.    Costantin, Chernin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information.  Costantin initially passed the Plug offering information on to Chernin, who passed the information on to Fishoff and subsequently also discussed the offering directly with Investment Bank A.  Costantin also passed the Plug offering information on to Fishoff directly via email.  After Fishoff learned of the offering, Fishoff sold Plug stock short and tipped Petrello about the Plug offering.  After Fishoff's tip, Petrello also shorted Plug stock and passed the confidential Plug offering information on to Spera, who then also shorted the stock.  Chernin also shorted Plug stock after tipping Fishoff.  These communications and trades all occurred after Investment Bank A brought Costantin over the wall on the Plug offering and before the offering was publicly announced.

129.    Costantin discussed the Plug offering with Chernin immediately after being brought over the wall on the morning of May 11, 2011, and Chernin then immediately discussed the offering with Fishoff.  Right after Costantin was brought over the wall -- and before Featherwood's first trade in Plug -- Chernin twice called both Costantin and Fishoff.  On May 11, 2011, Chernin made a three-minute call to Costantin at 11:18 a.m. and a one-and-a-half minute call to Fishoff at 11:31 a.m.  At 11:42 a.m., Chernin again called Costantin, this time for six minutes.  At 11:55 a.m., Chernin called Fishoff again for over six minutes.  Before that call ended, at 12:01 p.m., Fishoff entered a 5,000 share short sale in PLUG online in a Featherwood DVP account.  Fishoff shorted another 20,000 shares of PLUG online that day in a Featherwood DVP account.

130.    In addition to the telephone conversations described above, Fishoff also received confidential information about the Plug offering from Costantin by email on the day that Fishoff began shorting Plug.  As described above in paragraph, all emails sent to Costantin's Seaside email address were automatically forwarded to Fishoff's email address beginning no later than October 2010.  As a result, Fishoff received, at the time it was sent, the email, described above, that Investment Bank A sent to Costantin at 2:33 p.m. on May 11, 2011 containing confidential information about the Plug offering and confirming the prohibitions on disclosure, trading and other use of the information to which Costantin had agreed.

131.    From May 11, 2011 through the close of trading on May 24, 2011, Featherwood built a 231,633 share net short position in Plug at an average sale price of $3.31 per share, with both Fishoff and Chernin executing the post-May 11 short sales online in one or more Featherwood DVP accounts.

132.    Chernin knew about the Plug offering from his discussions with Costantin and Fishoff before he began shorting Plug.  In addition to the sequence of phone calls, emails and trades described above, Chernin emailed Investment Banker A-1, who had brought him over the wall on other offerings, about the Plug offering on May 17, 2011 and then spoke to him on the phone about it.  Shortly after calling both Fishoff and Costantin on the morning of May 17, 2011, Chernin sent the following email to Investment Banker A-1 at 11:22 a.m. that morning:  "PLS CALL WHEN U HAVE TIME.  STEVE WAS ASKING ME ABOUT PLUG."  The reference to "Steve" refers to Fishoff, as Investment Banker A-1 was not aware of Chernin's ties to Costantin.  At 1:18 p.m. that day, Investment Banker A-1 called Chernin for six minutes, and Chernin then promptly called both Fishoff and Costantin after speaking to Investment Banker A-1.  Chernin's first PLUG short sale came later that same afternoon.

133.    Chernin also managed to secure a 200,000 unit allocation in the Plug offering for Gold Coast.  Fishoff used the Plug shares that came with those units to cover Featherwood's short position at a profit, and exited Plug completely, after the public announcement of the $2.42 unit offering price on May 25, 2011.

134.    Pursuant to the scheme, Fishoff also tipped Petrello about the Plug offering, and Petrello then traded on the basis of that information in Brielle DVP accounts before the offering was publicly announced.  From May 13, 2011 -- two days after Costantin was brought over the wall and tipped Fishoff about the offering -- through May 18, 2011 -- the day of Brielle's first short sale in Plug -- Fishoff and Petrello spoke at least several times on the phone, and continued to speak on the phone in the days that followed.  From May 18 through May 24, 2011, Petrello built a net short position of 268,709 shares through online short sales at an average sale price of $3.29 per share in one or more Brielle DVP accounts.  Fishoff disclosed confidential Plug offering information that he had received from Costantin to Petrello before Brielle's first short sale in Plug on May 18, 2011.  Petrello covered Brielle's short position at a profit, and exited Plug completely, after the public announcement of the $2.42 unit offering price on May 25, 2011.

135.    Petrello in turn tipped Spera about the Plug offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced. Between May 13 (the date of Fishoff's tip to Petrello) and May 18, 2011, Petrello and Spera exchanged numerous calls.  Beginning on May 18, the same day that Brielle began shorting Plug, and continuing through May 24, Joleine built a net short position of 105,600 shares at an average price of $3.74, including 100,000 shares sold on May 18.  Petrello disclosed confidential Plug offering information that he had received from Fishoff to Spera during one or more

conversations between Petrello and Spera that occurred before Joleine's first short sale in Plug on May 18, 2011.  Spera covered Joleine's short position at a profit, and exited Plug completely, after the public announcement.

### The Second Plug Offering

136.     Fishoff, Chernin, Costantin and Petrello also engaged in illegal insider trading in connection with a second offering by Plug.  In March 2012, Investment Bank A marketed a $15 million CMPO for Plug that was priced and publicly announced after the market closed on March 22, 2012.  The details of the offering, including the share price and offering size, were publicly announced before the market opened on March 23, 2012.  The share price in the offering was $1.15 per share.

137.     On March 22, 2012, Plug's stock opened at $1.59 per share and closed down at $1.41 per share on volume of 1.01 million shares, which exceeded the aggregate volume for the prior three days.  On March 23, 2012, Plug's stock opened at $1.35 per share and closed at $1.40 per share -- a 15% drop and a 12% drop, respectively, from the March 22 opening price -- on volume of 2.56 million shares, more than 2.5 times higher than the already elevated March 22 volume.  As described below, the heavy short selling by Fishoff, Chernin and Petrello in advance of the offering had already depressed the stock price before the offering was even announced.

138.     Chernin and Gold Coast were brought over the wall by Investment Bank A and Gold Coast was allocated 200,000 shares in the offering.  Those shares first went into the Featherwood account at Prime Broker A and then went into Cedar Lane's account.  Cedar Lane, in an account Chernin and Costantin opened in February 2012 and that Fishoff backed and controlled, made $102,145 by selling Plug stock short after Chernin was brought over the wall and ahead of the public announcement of the offering, and Brielle, Oceanview, and Joleine made

$52,223, $28,683, and $35,912, respectively, by doing the same.  Featherwood also made $12,743 by separately selling the Plug shares that were allocated to Cedar Lane in the offering. Other than in connection with the earlier Plug offering described above, none of these entities had previously traded Plug securities.  The misappropriation of the offering information is detailed below.

139.    The banker, Investment Banker A-3, that brought Chernin over the wall on this Plug offering followed the same procedure that the other Investment Bank A bankers had followed on the Quantum, Solitario, and Plug offerings described above.  Investment Banker A-3 brought Chernin and Gold Coast over the wall during a nine minute phone call at 11:02 a.m. on March 9, 2012.  Pursuant to Investment Bank A's policy, Investment Banker A-3 secured Chernin's agreement to keep all information relating to the offering confidential and then provided Chernin with confidential information about the offering, including Plug's identity and the anticipated pricing and timing of the offering.  This information was material and non-public.

140.    Pursuant to Investment Bank A's policy, Investment Banker A-3 executed an attestation form shortly after bringing Chernin over the wall, at 11:30 a.m. on March 9, 2012. The banker's attestation form memorialized the fact that Chernin had been brought over the wall on the Plug offering earlier that morning and the confidentiality terms to which Chernin had agreed on behalf of Gold Coast.  The confidentiality provisions recited in the Plug attestation form were identical to the confidentiality provisions, and contained the same attestations by the banker confirming agreement to those terms, that are described above in the sections relating to the Quantum, Solitario and first Plug offerings.  Consistent with Investment Bank A policy, another employee of Investment Bank A sent an email to Chernin at his Gold Coast email address later that same day, at 12:18 p.m., confirming that Chernin and Gold Coast had agreed to

confidentiality restrictions regarding the issuer's name, the proposed transaction, and the timing and terms of the transaction and had also agreed not to transact in the issuer's securities. Those restrictions applied with equal force to Fishoff, who held himself out as, and was, Chernin's business partner in Gold Coast.

141.    Chernin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information. Chernin passed the Plug offering information on to Fishoff, over the phone and by email, and Chernin also passed the information on to Costantin. After Fishoff learned of the offering, Fishoff sold Plug stock short and tipped Petrello about the Plug offering. After Fishoff's tip, Petrello also shorted Plug stock, and they both passed the confidential Plug offering information on to Spera, who then also shorted the stock. Chernin also shorted Plug stock after tipping Fishoff. These communications and trades all occurred after Investment Bank A brought Chernin over the wall on the Plug offering and before the offering was publicly announced.

142.    Chernin discussed the Plug offering with Costantin immediately after being brought over the wall on the morning of March 9, 2012, and Chernin and Costantin proceeded to discuss the offering with Fishoff in the days that followed. At 11:12 a.m. that morning -- one minute after finishing the call with Investment Banker A-3 in which Chernin was brought over the wall -- Chernin placed a 15 minute call to Costantin. Chernin also spoke on the phone with Fishoff on multiple occasions, and the two of them exchanged calls with Costantin, between March 9 and March 20, 2012, the date of the first Plug short sale by any of the defendants in advance of the March 2012 Plug offering.

143.    In addition to the telephone conversations described above, Fishoff also received confidential information about the March 2012 Plug offering from Chernin by email before

Fishoff or any other Defendant began shorting Plug in advance of this offering. As described above, all emails sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address beginning no later than December 16, 2010. As a result, Fishoff received, at the time it was sent, the email that Investment Bank A sent to Chernin on March 9, 2012 containing confidential information about the Plug offering and confirming the prohibitions on disclosure, trading and other use of the information to which Chernin had agreed on behalf of Gold Coast.

144.    Chernin was the first defendant to short Plug stock during this period, and he did so following a rapid series of additional calls with Investment Banker A-3 and with Fishoff and Costantin. At 8:52 a.m. on March 20, 2012, Chernin spoke on the phone with Investment Banker A-3 for three-and-a-half minutes. At 8:56 a.m., Chernin placed a three minute call to Fishoff. At 9 a.m., Chernin placed a two minute call to Costantin. At 1:25 p.m., Fishoff placed a three minute call to Chernin. At 1:30 p.m., Chernin spoke on the phone with Investment Banker A-3 for four minutes. As soon as that call ended, at 1:35 p.m., Chernin placed a one minute call to Fishoff. Beginning one minute after that call ended, at 1:37 p.m., Chernin entered short sales of Plug stock totaling 20,801 shares in a Cedar Lane brokerage account through his online trading platform.

145.    Chernin and Fishoff continued to short Plug stock in the Cedar Lane account up until the announcement of the Plug offering. From March 20 through March 22, 2012, Cedar Lane, through trades executed by Chernin and Fishoff, built an open short position of 275,475 shares at an average sale price of $1.52 per share. Beginning with his March 20 short sales, Chernin sold short a total of 175,475 Plug shares by the close of trading on March 22. Fishoff began shorting Plug stock online in the Cedar Lane account on the morning of March 21, 2012.

By the close of trading on March 22, 2012, Fishoff had sold short 100,000 shares of Plug in the Cedar Lane account.  Cedar Lane covered its entire short position at a profit, and exited Plug completely, after the public announcement of the $1.15 per share offering price on March 23, 2012.

146.    Fishoff also sold short an additional 95,586 shares of Plug stock prior to the announcement of the offering.  A portion of those short sales, 66,900 shares, were allocated to an Oceanview brokerage account on March 21, 2012.  Fishoff sold short a total of 77,850 Plug shares that day through his online trading platform at an average sale price of $1.66 per share, and a 66,900 share short sale of Plug stock at the same average sale price was booked into the Oceanview account that same day.  Oceanview covered this short position at a profit, and exited Plug completely, after the public announcement of the $1.15 per share offering price on March 23, 2012.

147.    Pursuant to the scheme, Fishoff also tipped Petrello about the March 2012 Plug offering, and Petrello then traded on the basis of that information in a Brielle DVP account before the offering was publicly announced.  On March 20, 2012 -- the day on which Chernin began shorting Plug and the day before Fishoff began shorting Plug -- Fishoff at least twice spoke to Petrello on the phone, for ten minutes at 3:17 p.m. and for 13 minutes at 9:17 p.m.  At 9:31 a.m. on the next day (March 21), Petrello began shorting Plug stock online in the Brielle account.  Between then and the close of trading on March 22, Petrello sold short a total of 193,431 Plug shares through his online trading platform at an average sale price of $1.57 per share.  The sale of 120,041 of those shares was booked into a Brielle DVP account.  Fishoff disclosed confidential Plug offering information that he had received from Chernin and Costantin to Petrello before Petrello's first short sale in Plug on March 21, 2012.  Petrello covered Brielle's

short position at a profit, and exited Plug completely, after public announcement of the $1.15 per share offering price on March 23, 2012.

148.    Fishoff and Petrello both tipped Spera about the Plug offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced.  On March 20, 2012, the same day that Chernin tipped Fishoff, and Fishoff tipped Petrello, Fishoff called Spera three times.  Spera also spoke with Petrello multiple times on March 20 and 21.  On March 21, both Spera and Petrello, directly through their online accounts with DVP Broker C, entered shorted sales in Plug that were all then allocated to the Joleine account.  Between March 21 and 22, Joleine built a net short position of 98,390 shares sold at an average price of $1.52.  Fishoff and Petrello disclosed confidential Plug offering information to Spera during one or more conversations that occurred before Joleine's first short sale in Plug on March 21.  Spera covered Joleine's short position at a profit, and exited Plug completely, after the public announcement.

**<u>Synergy</u>**

149.    In April and May 2012, Investment Bank D marketed a $45 million CMPO for Synergy that was priced and publicly announced after the market closed on May 3, 2012.  The details of the offering, including the share price and offering size, were publicly announced before the market opened on May 4, 2012.  The share price in the offering was $4.50 per share.

150.    On May 3, 2012, Synergy's stock closed at $5.69 per share on volume of 892,200 shares.  On May 4, 2012, Synergy's closing price fell to $4.50 per share, a 20.9% drop from the prior day's closing price, on volume of over 4.2 million shares, nearly five times greater than the May 3 volume.

151.    Chernin and Gold Coast were brought over the wall by Investment Bank D on the Synergy offering, and Gold Coast was allocated 225,000 shares in the offering.  Those shares, however, went into the Cedar Lane account at Prime Broker A.  Investment Bank D also brought Fishoff and Featherwood over the wall on the Synergy offering, and Featherwood was allocated 70,000 shares in the offering.  Those shares went into the Featherwood account at Prime Broker A.  Cedar Lane made $86,475 and Featherwood made $74,951 by selling Synergy stock short after Chernin and Fishoff were brought over the wall and ahead of the public announcement of the offering, and Brielle and Joleine made $145,988 and $114,170, respectively, by doing the same.  None of the entities had previously traded Synergy securities, and Featherwood had traded Synergy securities only once before, at the time of an earlier Synergy offering marketed by Investment Bank D.  The misappropriation of the offering information in April and May of 2102 is detailed below.

152.    Using a wall-crossing procedure similar to the procedures employed by Investment Bank A, Investment Bank B and Investment Bank C, Investment Bank D brought Chernin over the wall on the Synergy offering at or about 9:01 a.m. on April, 30, 2012.  On April 27, 2012, when Investment Bank D began due diligence on the offering, a banker from Investment Bank D, Investment Banker D-1, called Chernin and they exchanged several calls over the course of the day.  Three days later, on April 30, 2012, Investment Bank D began to contact potential investors in the offering and brought Chernin over the wall.  That morning, beginning at 8:44 a.m., Chernin made several brief calls to Investment Banker D-2, who had called him on April 27, and another, more senior banker from Investment Bank D, Investment Banker D-2.  At 8:59 a.m., Chernin placed a five minute call to Investment Banker D-2 and was brought over the wall during that call.  Investment Banker D-2 secured Chernin's agreement to

56

keep all information relating to the offering confidential and then provided Chernin with

confidential information about the offering, including Synergy's identity.  This information was

material and non-public.  A document from Investment Bank D labeled "Confidentially

contacted list" states that Chernin, as a representative of Gold Coast, was confidentially solicited

to participate in the offering and brought over the wall at 9:01 a.m.  At 9:44 a.m., Investment

Banker D-1 sent an email to Chernin captioned "Synergy Pharmaceuticals, Inc. - Confidentiality

and Non-Disclosure Agreement."  The email, which was sent to Chernin's Gold Coast email

address, confirmed that Chernin had been brought over the wall and had agreed to maintain the

confidentiality of the offering information, as follows:

> Pursuant to our telephone conversation and as an inducement to obtain
> confidential investment information, this will confirm that you have agreed to
> keep the information to be disclosed/discussed as confidential and have agreed to
> not disclose the content of the information to any party not bound by our
> agreement.  Furthermore, you agree not to use the information presented in
> connection with any investment outside the nature and scope of the proposed
> investment opportunity.  This agreement shall terminate at the earliest of the
> public release of the information disclosed/discussed the report or the
> completion/termination of the proposed offering.

Those restrictions applied with equal force to Fishoff, who held himself out as, and was,

Chernin's business partner in Gold Coast.

153.    Chernin and Fishoff knowingly violated the confidentiality agreement and

misappropriated the offering information.  Chernin passed the Synergy offering information on

to Fishoff over the phone and by email, and Fishoff subsequently was also brought over the wall

on the offering by Investment Bank D.  After Fishoff learned of the offering, Fishoff sold

Synergy stock short and tipped Petrello about the Synergy offering.  After Fishoff's tip, Petrello

also shorted Synergy stock, and they both passed the confidential Synergy offering information

on to Spera, who then also shorted the stock.  Chernin also shorted Synergy stock after tipping

Fishoff.  These communications and trades all occurred after Investment Bank D brought Chernin over the wall on the Synergy offering and before the offering was publicly announced.

154.    Chernin discussed the Synergy offering with Fishoff and Costantin immediately after being brought over the wall on the morning of April 30, 2012, and both Chernin and Fishoff began shorting Synergy stock later that morning.  Chernin began calling Fishoff and Costantin that morning as soon as Chernin completed his 8:59 a.m. call with Investment Banker D-2 in which Chernin was brought over the wall.  At 9:05 a.m., Chernin placed a four-minute call to Fishoff and then also exchanged calls with Costantin.  Following those calls, Chernin and Fishoff began shorting Synergy stock online in different accounts.  Chernin did his short selling in a Cedar Lane DVP account, while Fishoff used a Featherwood DVP account.

155.    In addition to the telephone conversations described above, Fishoff also received confidential information about the Synergy offering from Chernin by email before Fishoff began shorting Synergy stock in advance of the offering.  As described above, all emails sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address beginning no later than December 16, 2010.  As a result, Fishoff received, at the time it was sent, the email that Investment Bank D sent to Chernin at 9:44 a.m. on April 30, 2012 containing confidential information about the Synergy offering and confirming the prohibitions on disclosure and other use of the information to which Chernin had agreed on behalf of Gold Coast.

156.    On April 30, 2012, Chernin sold short 17,000 shares of Synergy stock in the Cedar Lane account between 9:30 a.m. -- less than 30 minutes after being brought over the wall and speaking with Fishoff and Costantin -- and 3:58 p.m.  On that same day, Fishoff sold short 10,000 shares of Synergy stock in the Featherwood account between 11:47 a.m. -- after he had

spoken to Chernin about the offering and received from him the email from Investment Bank D confirming that Chernin was over the wall and had agreed to restrictions on use of the confidential offering information -- and 3:11 p.m.

157.     Pursuant to the scheme, Fishoff also tipped Petrello about the Synergy offering earlier that day (April 30), and Petrello then immediately traded on the basis of that information in a Brielle DVP account.  At 11:31 a.m. -- shortly after Fishoff spoke with Chernin about the offering and received the email from Investment Bank D confirming that Chernin was over the wall and just before Fishoff began shorting Synergy -- Fishoff called Petrello for 12 minutes. Less than 90 minutes later, at 1:11 p.m., Petrello began shorting Synergy stock online in a Brielle DVP account.  Fishoff disclosed confidential Synergy offering information that he had received from Chernin and Investment Bank D to Petrello before Petrello executed this short sale, and thereafter.  Over the course of that day, Brielle sold short a total of 10,000 shares of Synergy stock.

158.     Shortly after Fishoff's last Synergy short sale on April 30, 2012, Fishoff himself was brought over the wall on the Synergy offering by Investment Bank D in a phone call, initiated by Fishoff, with Investment Banker D-1 at 4:02 p.m. that day.  Investment Banker D-1 secured Fishoff's agreement to keep all information relating to the offering confidential and then provided Fishoff with confidential information about the offering, including Synergy's identity. Investment Bank D's "over-the-wall" list of those who were "Confidentially contacted" about the Synergy offering indicates that Fishoff was confidentially solicited to participate in the offering and brought over the wall as a representative of Featherwood at or about 4:00 p.m. on April 30, 2012.

159.     Fishoff and Petrello both tipped Spera about the Synergy offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced.  On April 30, 2012, the same day that Chernin tipped Fishoff and Fishoff tipped Petrello, and over the next several days, Spera spoke with Fishoff and Petrello multiple times.  On May 1 and May, 2012, Joleine's account at DVP Broker C shorted Synergy stock.  Fishoff and Petrello disclosed confidential Synergy offering information to Spera during one or more conversations that occurred before Joleine's first short sale in Synergy on May 1.

160.     On May 3, 2012, Spera was also brought over the wall on the Synergy offering by Investment Bank D.  Investment Banker D-1 secured Spera's agreement to keep all information relating to the offering confidential then provided Spera with confidential information about the offering, including Synergy's identity.  Investment Bank D's "over-the-wall" list of those who were "Confidentially contacted" about the Synergy offering indicates that Spera was confidentially solicited to participate in the offering and brought over the wall as a representative of Joleine at or about 1:45 p.m. on May 3, 2012.  That was confirmed by an email sent to Spera by Investment Banker D-1 at 1:49 p.m.  That email recited the same restrictions as the email that the banker had sent to Chernin on April 30.  Despite Spera's agreement to abide by these terms, less than two hours later (at 3:21 and 3:23 p.m.), he shorted additional shares of Synergy in Joleine's account at DVP Broker C using his online trading platform.

161.     Between April 30, 2012 and the announcement of the Synergy offering on the evening of May 3, 2012, Chernin and Fishoff continued to speak frequently to each other and to the bankers from Investment Bank D, and Fishoff spoke often with Petrello.  As detailed above, Fishoff and Petrello in turn spoke with Spera, who also then shorted the stock, both before and after Spera himself was brought over the wall.  Chernin, Fishoff, Petrello and Spera continued to

short Synergy stock during this period.  Through the close of trading on May 3, 2012, Chernin built a total open short position of 73,654 shares in a Cedar Lane account at an average sale price of $5.67 per share; Fishoff built a total open short position of 60,000 shares in a Featherwood account at an average sale price of $5.66 per share, Petrello built a total open short position of 130,000 shares in a Brielle account at an average sale price of $5.53 per share, and Spera built a total open short position of 100,000 shares in a Joleine account at an average sale price of $5.64 per share.

162.    On May 4, 2012, after the Synergy offering and the $4.50 per share offering pricing were announced and the market price dropped, Cedar Lane, Featherwood, Brielle, and Joleine profited by covering their entire short positions at the reduced market price.  All four entities also obtained Synergy shares in the offering.  Although Petrello and Brielle were not brought over the wall during the confidential marketing phase by Investment Bank D, Brielle purchased 100,000 offering shares once the CMPO was opened up to the public.

**CPI**

163.    In May and June 2012, Investment Bank A marketed a $12 million CMPO for CPI that was priced and publicly announced after the market closed on June 7, 2012.  The details of the offering, including the share price and offering size, were publicly announced before the market opened on June 8, 2012.  The share price in the offering was $12 per share.

164.    On June 7, 2012, the price of CPI stock opened at $14.10 per share and closed at $12.65 per share on volume of 173,640 shares.  On June 8, 2012, the CPI closing price fell to $12 per share, a 14.9% drop from the prior day's opening price and a 5% drop from the prior day's closing price, on volume of 807,572 shares, more than four-and-a-half times the June 7

volume.  As described below, the heavy short selling by Fishoff, Chernin and Petrello in advance of the offering had already depressed the stock price before the offering was even announced.

165.     Chernin and Gold Coast were brought over the wall by Investment Bank A on the CPI offering, and Gold Coast was allocated 85,000 shares in the offering.  Those shares, however, went into the Cedar Lane account at Prime Broker A.  Cedar Lane and Featherwood respectively made $54,831 and $92,110 by selling CPI stock short after Chernin was brought over the wall and ahead of the public announcement of the offering, and Brielle and Joleine made $98,706 and $43,693, respectively, by doing the same.  None of these entities had previously traded CPI securities.  The misappropriation of the offering information is detailed below.

166.     The banker, Investment Banker A-3, that brought Chernin over the wall on the CPI offering followed the same procedure that he and the other Investment Bank A bankers had followed on the Quantum, Solitario, and Plug offerings described above.  Investment Banker A-3 brought Chernin over the wall on the CPI offering during a two-and-a-half minute phone call at 1:48 p.m. on May 30, 2012.  Pursuant to Investment Bank A's policy, Investment Banker A-3 secured Chernin's agreement to keep all information relating to the offering confidential and then provided Chernin with confidential information about the offering, including CPI's identity and the anticipated pricing and timing of the offering.  This information was material and non-public.

167.     Immediately after bringing Chernin over the wall on the CPI offering, at 1:52 p.m. on May 30, 2012, Investment Banker A-3 emailed another employee of Investment Bank A stating "Ron Chernin over the wall on [CPI].  Will do call tomorrow at 7am pst."  During the wall-crossing call, Chernin had told the banker that Chernin and Fishoff wanted to speak with

CPI's management before the transaction was priced, and that is the "call" referenced by the banker in the second sentence of his email.  Consistent with Investment Bank A policy, another employee of Investment Bank A sent an email to Chernin at his Gold Coast email address later that same day, at 5:03 p.m. on May 30, 2012, confirming that Chernin and Gold Coast had agreed to confidentiality restrictions regarding the issuer's name, the proposed transaction, and the timing and terms of the transaction and had also agreed not to transact in the issuer's securities.  Those restrictions applied with equal force to Fishoff, who held himself out as, and was, Chernin's business partner in Gold Coast.

168.    Chernin and Fishoff knowingly violated the confidentiality agreement and misappropriated the offering information.  Chernin passed the CPI offering information on to Fishoff, over the phone and by email, and Chernin also passed the information on to Costantin. After Fishoff learned of the offering, Fishoff sold CPI stock short and tipped Petrello about the CPI offering.  After Fishoff's tip, Petrello also shorted CPI stock, and they both passed the confidential CPI offering information on to Spera, who then also shorted the stock.  Chernin also shorted CPI stock after tipping Fishoff.  These communications and trades all occurred after Investment Bank A brought Chernin over the wall on the CPI offering and before the offering was publicly announced.

169.    Chernin discussed the CPI offering with Fishoff and Costantin immediately after being brought over the wall on the afternoon of May 30, 2012, and Fishoff began shorting CPI stock within minutes of his conversations with Chernin that day.  Right after Chernin's call with Investment Banker A-3 ended at 1:52 p.m., Chernin called Costantin for two minutes and, at 1:54 p.m., called Fishoff for eight-and-a-half minutes.  At 2:03 p.m., Chernin quickly called Fishoff again, for less than 30 seconds.  At 2:03 p.m., Fishoff placed a 5,000 share short sale of

CPI stock online at $14.55 per share in a Featherwood DVP account, with the first execution occurring at 2:06 p.m.  Chernin disclosed confidential CPI offering information that he had received from Investment Bank A to Fishoff during one or more of the conversations between Chernin and Fishoff that occurred before Fishoff's first short sale in CPI on May 30, 2012.

170.    In addition to the telephone conversations described above, Fishoff also received confidential information about the CPI offering from Chernin on May 30, 2012 by email.  As described above, all emails sent to Chernin's Gold Coast email address were automatically forwarded to Fishoff's email address beginning no later than December 16, 2010.  As a result, Fishoff received, at the time it was sent, the email that Investment Bank A sent to Chernin on May 30, 2012 containing confidential information about the CPI offering and confirming the prohibitions on disclosure, trading and other use of the information to which Chernin had agreed on behalf of Gold Coast.

171.    Fishoff continued shorting CPI stock online in Featherwood accounts through June 7, 2012, and Featherwood sold short a total of 43,627 CPI shares at an average sale price of $14.11 per share.  Chernin also shorted CPI stock after being brought over the wall on the CPI offering on May 30, 2012.  From May 31, 2012 through June 5, 2012, Chernin sold short a total of 21,000 CPI shares online in a Cedar Lane account at an average sale price of $14.58 per share. Featherwood and Cedar Lane covered their entire short positions at a profit, and exited CPI completely, after the public announcement of the $12 per share offering price on June 8, 2012, with Cedar Lane using the offering shares it received to cover its short position.  Cedar Lane sold the balance of the 85,000 CPI shares it received in the offering into the market for an additional profit.

172.     Pursuant to the scheme, Fishoff also tipped Petrello about the CPI offering, and Petrello then traded on the basis of that information in a Brielle DVP account before the offering was publicly announced.  At 5:07 p.m. on May 30, 2012, Petrello and Fishoff spoke on the phone for six-and-a-half minutes.  This call occurred just a few hours after Fishoff was tipped about the offering and started shorting CPI, and just minutes after Fishoff received the email from Investment Bank A confirming that Chernin was over the wall and the restrictions on use of the offering information to which Chernin had agreed.  Between then and June 5, 2012, Petrello and Fishoff exchanged another twelve calls.  Petrello began shorting CPI through Brielle on June 5 and through June 7, 2012, Brielle established a 54,315 share short position in CPI at an average sale price of $13.81 per share.  Fishoff disclosed confidential information about the CPI offering that he had received from Chernin to Petrello before Petrello's first short sale in CPI on June 5, 2012.  Petrello covered Brielle's short position at a profit, and exited CPI completely, after public announcement of the $12 per share offering price on June 8, 2012.

173.     Fishoff and Petrello tipped Spera about the CPI offering, and Spera then traded on the basis of that information in Joleine's DVP accounts before the offering was publicly announced.  Between May 31 and June 5, 2012, Spera spoke with Petrello and Fishoff multiple times.  Between June 5 and June 7, Joleine built a net short position of 31,254 shares sold at an average price of $13.40.  Fishoff and Petrello disclosed confidential CPI offering information to Spera during one or more conversations that occurred before Joleine's first short sale in CPI on June 5.  Spera covered Joleine's short position at a profit, and exited CPI completely, after the public announcement.

**Ampio**

174.     In July 2012, Investment Bank D marketed a $15 million CMPO for Ampio that was priced and publicly announced after the market closed on July 12, 2012.  The details of the offering, including the share price and offering size, were publicly announced later that same evening.  The share price in the offering was $3.25 per share.

175.     On July 12, 2012, Ampio stock closed at $3.66 per share on volume of 1,315,600 shares.  On July 13, 2012, Ampio's closing price fell to $3.21 per share, a 10% drop from the prior day's closing price, on volume of over 3.9 million shares, nearly three times greater than the July 12 volume.

176.     Chernin and Fishoff were both brought over the wall by Investment Bank D on the Ampio offering, Chernin on behalf of Cedar Lane and Fishoff on behalf of Featherwood. Cedar Lane was allocated 700,000 shares in the offering.  Cedar Lane made a profit of $186,459 by selling Ampio stock short after Chernin and Fishoff were brought over the wall and ahead of the public announcement of the offering.  Joleine, Brielle, and Oceanview made $190,148, $172,039 and $54,509, respectively, by doing the same.  Joleine and Oceanview had never previously traded Ampio securities.  Fishoff and Brielle had traded Ampio securities on only one prior occasion, before another Ampio offering nearly one year earlier.  The misappropriation of the July 2012 offering information is detailed below.

177.     Using a wall-crossing procedure similar to the procedure Investment Bank D employed on the Synergy offering described above, Investment Bank D brought both Chernin and Fishoff over the wall on the Ampio offering almost simultaneously on the morning of July 9, 2012.  Investment Bank D began contacting potential investors in the offering that day and between 9:05 a.m. and 9:51 a.m., Chernin placed eleven brief phone calls to the same two

bankers from Investment Bank D that marketed the Synergy offering.  During this time, Chernin also exchanged several calls with Costantin and Fishoff.  At 9:51 a.m., Chernin spoke on the phone for nine minutes with Investment Banker D-2 and was brought over the wall during that call.  At 9:55 a.m., Investment Banker D-1 placed a three-and-a-half minute call to Fishoff and brought him over the wall during that call.  The bankers secured Chernin and Fishoff's agreement to keep all information relating to the offering confidential and then provided Chernin and Fishoff with confidential information about the offering, including Ampio's identity.  This information was material and non-public.  Investment Bank D's "AMPIO Over the Wall" list, indicates that Chernin, as a representative of Cedar Lane, and Fishoff, as a representative of Featherwood, were confidentially solicited to participate in the offering and brought over the wall at or about 9:45 a.m. on July 9, 2012.

178.    Chernin and Fishoff knowingly violated their confidentiality agreements and misappropriated the offering information.  Chernin passed the Ampio offering information on to Costantin, who then shorted Ampio stock, and Chernin later also shorted Ampio stock.  After Fishoff was brought over the wall, he also sold Ampio stock short and tipped Petrello about the Ampio offering.  After Fishoff's tip, Petrello also shorted Ampio stock, and they both passed the confidential Ampio offering information on to Spera, who then also shorted the stock.  These communications and trades all occurred after Investment Bank D brought Chernin and Fishoff over the wall on the Ampio offering and before the offering was publicly announced.

179.    Chernin discussed the Ampio offering with Costantin and Fishoff immediately after being brought over the wall on the morning of July 9, 2012, and Costantin began shorting Ampio stock immediately after speaking to Chernin that that morning.  Right after his 9:51 a.m. call with Investment Banker D-2, Chernin exchanged phone calls with Costantin and Fishoff.

At 10:03 a.m. and 10:08 a.m., Chernin called Costantin for three and six minutes respectively and tipped him about the upcoming Ampio offering.  Costantin began shorting Ampio stock in a Cedar Lane account at 10:06 a.m.  On July 10, 2012, Chernin also began shorting Ampio stock in the Cedar Lane account and through the close of trading on July 12, 2012, Costantin and Chernin built a total open short position of 211,000 shares in the Cedar Lane account at an average sale price of $4.15 per share.  Fishoff, Chernin and Costantin continued to speak frequently to each other during this period, and Fishoff also shorted Ampio stock on July 12, 2012.

180.     Pursuant to the scheme, Fishoff tipped Petrello and Spera about the Ampio offering on July 9, 2012, and Petrello and Spera then immediately traded on the basis of that information in Brielle and Joleine's DVP accounts.  At 10:34 a.m. that day -- less than an hour after Fishoff was brought over the wall and spoke to Chernin on the phone -- Fishoff called Petrello for approximately 15 ½ minutes.  During that call -- between 10:41 a.m. and 10:48 a.m. -- Petrello sold short 26,600 shares of Ampio in the Brielle account.  Fishoff disclosed confidential  information about the Ampio offering that he had received from Chernin and Investment Bank D to Petrello before Petrello executed these short sales, and thereafter.  Shortly before his 10:34 a.m. call to Petrello, Fishoff also tipped Spera, calling him at 10:23 a.m. for several minutes.  Approximately half an hour later, Joleine's account at DVP Broker C sold short 25,000 shares of Ampio.

181.     Fishoff, Petrello, and Spera continued to speak frequently between July 9 and July 12, 2012, and Petrello and Spera continued to sell Ampio stock short during this period.  Through the close of trading on July 12, 2012, Petrello built a total open short position of 170,687 shares in the Brielle account at an average sale price of $4.30 per share.  Petrello also

built a short position of 60,000 shares in Ampio from July 10 through July 12, 2012 in an Oceanview account at an average sale price of $4.15 per share.  Between July 9 and 12, Spera built a total open short position of 202,500 shares in the Joleine account at an average sale price of $4.18 per share.

182.     On July 13, 2012, after the Ampio offering and the $3.25 per share offering pricing were announced and the market price dropped, Cedar Lane, Brielle, Oceanview, and Joleine profited by covering their entire short positions at the reduced market price.  Cedar Lane and Brielle also obtained Ampio shares in the offering.  Although Petrello and Brielle were not brought over the wall during the confidential marketing phase by Investment Bank D, Brielle purchased 50,000 offering shares once the CMPO was opened up to the public.

**Biodel**

183.     In June 2013, Investment Bank E marketed a $19.5 million CMPO for Biodel that was publicly announced after the market closed on June 18, 2013.  The details of the offering, including the share price and offering size, were publicly announced before the market opened on June 19, 2013.  The share price in the offering was $4.35 per share.

184.     On June 18, 2013, Biodel closed at $4.76 per share on volume of 1,495,500 shares.  On June 19, 2013, Biodel closed at $4.35, an 8.6% drop from the prior day's closing price, on volume of 3,169,300 shares, more than twice the June 18 volume.

185.     Through Associate A, who held himself out as a Cedar Lane portfolio manager and used a Cedar Lane email address, Cedar Lane was brought over the wall by Investment Bank E on the Biodel offering, and Cedar Lane was allocated 100,000 shares in the offering.  Cedar Lane, Joleine, and Brielle sold Biodel stock short after Associate A and Cedar Lane were brought over the wall and ahead of the public announcement of the offering.  None of the entities

had previously traded Biodel securities.  The misappropriation of the offering information is detailed below.

186.    Investment Bank E began to contact potential investors in the offering in June 2013.  Using a wall-crossing procedure similar to the procedures employed by Investment Bank A and the other investment banks referenced above, Investment Bank E brought Associate A over the wall on the Biodel offering on behalf of Cedar Lane on the morning of June 13, 2013. At 11:45 a.m. on June 13, Investment Banker E-1, a banker at Investment Bank E, placed a thirteen minute call to Associate A and brought him over the wall on that call.  While on the phone, Investment Banker E-1, consistent with Investment Bank E's policy, secured Associate A's agreement on behalf of Cedar Lane to keep all information relating to the offering confidential and, as such, to refrain from, among other things, disclosing the offering information to others and from trading in the issuer's securities before the offering was announced.  After obtaining Associate A's agreement to these confidentiality terms, Investment Banker E-1 provided Associate A with confidential information about the Biodel offering, including Biodel's identity, the general deal size, and its timing.  This information was material and non-public.

187.    At 12:00 p.m. on June 13, 2013, two minutes after the conclusion of his call with Associate A, Investment Banker E-1 sent an email confirming the terms of the confidentiality agreement to Associate A at both his Cedar Lane email address and his personal email address. The email stated, in relevant part, as follows:

> We appreciate your interest in purchasing securities proposed for issuance by Biodel Inc., (the "Proposed Issuance") about which we disclosed to your earlier certain nonpublic information, including, among other things, the issuer's name and the timing, structure and size of the transaction (the "Information").  As Sole Bookrunner for and on behalf of Biodel Inc., we hereby confirm your previously communicated agreement to treat the Information as confidential.  In accordance with your agreement, you have agreed not to provide the Information to any person or entity other than those people employed by or otherwise with a need to

know such information for the purpose of making a decision to participate in the
Proposed Issuance and not to use the Information for any other purpose or trade
on it until the issuer has publicly released such Information.

Those restrictions applied with equal force to Fishoff, Chernin and Costantin, who held

themselves out as, and were, Associate A's business partners in Cedar Lane.

188.   Fishoff, Chernin and Costantin knowingly violated the confidentiality agreement

and misappropriated the Biodel offering information.  Associate A passed the Biodel offering

information on to Fishoff, Chernin and Costantin over the phone and by email, and Fishoff also

learned of the Biodel offering from Chernin.  After Fishoff, Chernin and Costantin learned of the

offering, Fishoff and Chernin sold Biodel stock short and Fishoff tipped Petrello about the

Biodel offering.  After Fishoff's tip, Petrello's Brielle account also shorted Biodel stock.  Fishoff

also passed the confidential Biodel offering information on to Spera, who then also shorted the

stock.  These communications and trades all occurred after Investment Bank E brought Associate

A over the wall on the Biodel offering and before the offering was publicly announced.

189.   Associate A discussed the Biodel offering with Costantin and Chernin

immediately after being brought over the wall on the morning of June 13, 2013, and Chernin and

Fishoff both began shorting Biodel stock shortly thereafter.  Associate A's first calls after his call

with Investment Banker E-1 in which Associate A was brought over the wall were to Costantin

and Chernin.  At 11:59 a.m., one minute after his call with Investment Bank E ended, Associate

A placed a call lasting 1:17 to Costantin, followed immediately by a 27 second call to Chernin.

At 12:09 p.m., Associate A called Costantin for approximately six minutes, and conferenced in

Chernin.   Immediately following that call, at 12:16 a.m., Chernin placed a one and a half minute

call to Fishoff.  One minute after Chernin's call to Fishoff -- at 12:17 p.m. -- Associate A

forwarded to Chernin and Costantin the email that Associate A had received from Investment

Banker E-1.  In his forwarding email, Associate A summarized the key facts about the Biodel offering for them as follows:  "OTW for BIOD.  $15-20m CMPO.  Pricing Tues., 6/18.  meeting w/ management on 6/18. 10:30am EDT.  more to follow."  One minute later, at 12:18 p.m., Chernin began shorting Biodel stock online in a Cedar Lane DVP account, selling short a total of 19,900 shares of Biodel stock that day.  At 2:14 and 2:15 p.m., Associate A placed brief calls to Fishoff and Chernin, and at 2:16 p.m., Chernin called Associate A back for approximately 10 minutes.  Associate A held an additional call for almost four minutes with Costantin at 2:37 p.m. Less than one hour after that, at 3:26 p.m., Fishoff also began shorting Biodel stock online in a Cedar Lane DVP account, selling short a total of 15,000 shares of Biodel stock that day.

190.     In addition to the telephone conversations with Chernin and Associate A described above, Fishoff also received confidential information about the Biodel offering from Associate A by email on June 13, 2013, before Chernin and Fishoff began shorting Biodel and before Fishoff tipped Petrello.  As described above with respect to the email addresses of Chernin and Costantin, all emails sent to Associate A's Cedar Lane email address were automatically forwarded to Fishoff's email address beginning no later than June 13, 2013.  As a result, Fishoff received, at the time it was sent, the email that Investment Banker E-1 sent to Associate A at 12:00 p.m. on June 13, 2013 containing confidential information about the Biodel offering and setting forth the prohibitions on disclosure and misuse of the information to which Associate A had agreed on behalf of Cedar Lane.

191.     Pursuant to the scheme, Fishoff tipped Petrello about the Biodel offering shortly after 12:00 p.m. on June 13, 2013.  Fishoff called Petrello for nine seconds at 12:05 p.m. that day -- five minutes after receiving the "over the wall" email from Investment Bank E -- and then exchanged a dozen calls with Petrello over the next several hours, including a call lasting 4:35 at

12:26 p.m.  Petrello began shorting Biodel stock online in a Brielle DVP account shortly after

first speaking to Fishoff that day.  Fishoff disclosed confidential Biodel offering information that

he had received from Associate A and Chernin to Petrello before the Brielle short sales began,

and thereafter.  Over the course of June 13, 2013, Petrello sold short a total of 25,000 shares of

Biodel stock in the Brielle account.

192.     Pursuant to the scheme, Fishoff also tipped Spera about the Biodel offering.

Fishoff exchanged multiple calls with Spera from June 13 through June 19, 2013.  Joleine's

account at DVP Broker C began shorting Biodel stock online in a Joleine's DVP account early

on the morning of June 14.  On June 18, Spera executed an additional 17,600 share short sale of

Biodel stock directly using his Joleine online account platform.

193.     Between June 13, 2013 and the announcement of the Biodel offering after market

close on June 18, 2013, Associate A continued to communicate frequently with Fishoff, Chernin

and Costantin and with the bankers from Investment Bank E, and Fishoff spoke often with

Chernin, Costantin, Spera, and Petrello.  For example, on June 18, 2013 at 10:31 a.m., Associate

A emailed Fishoff, Chernin and Costantin to inform them that he had placed an order with

Investment Bank E for an allocation of 125,000 shares of Biodel.

194.     The unlawful benefits that these defendants planned to reap from their Biodel

short sales were curtailed by an unexpected development that caused Biodel's stock price to rise

on the eve of the offering announcement.  On June 17, 2013, at 8:58 a.m., Biodel announced that

it had made "significant progress" in the development of insulin-related treatments for diabetes.

Biodel stock closed that day at $4.39 per share, a substantial increase over the prior day's closing

price of $4.22 per share.  On June 18, 2013, Biodel closed even higher, at $4.76 per share, well

above the prices at which the Cedar Lane and Brielle accounts had shorted the stock.  Chernin

purchased 12,900 shares that day in order to partially cover Cedar Lane's open short position at a loss, and the Cedar Lane account also sold short an additional 20,000 shares at the new, higher price.  Petrello expressed concern with the rising Biodel stock price in an email to Fishoff that same day stating:  "RUNNING  [-]  IT DOESNT END."

195.    By the close of trading on June 18, 2013, Chernin and Fishoff built a total open short position of 47,000 shares in a Cedar Lane account at an average sale price of $4.38 per share, Petrello built a total open short position of 31,000 shares in a Brielle account at an average sale price of $4.24 per share, and Spera built a short position of 50,000 shares in a Joleine account at an average sale price of $4.41 per share.  While the intervening positive news had moved the stock price up and reduced the profitability of Cedar Lane and Brielle's short positions, the market price dropped on June 19, 2013, after the Biodel offering and the $4.35 per share offering pricing were announced, and Cedar Lane and Brielle were able to cover their entire short positions at the reduced, post-announcement market price.  Joleine was able to cover its short position for a profit of $3,325.

**Aeterna**

196.    In July 2013, Investment Bank F marketed a $7.8 million registered direct offering for Aeterna.  The Aeterna offering involved the sale of units consisting of shares and warrants and the details of the offering, including the unit price and offering size, were publicly announced before the market opened on July 25, 2013.  The unit price in the offering was $1.50 per unit.  Each unit consisted of one share of stock and a warrant to purchase .50 shares at $1.85 per share.

197.    On July 24, 2013, Aeterna's stock closed at $1.77 per share on volume of 617,700 shares.  On July 25, 2013, Aeterna's closing price fell to $1.40 per share, a 21% drop from the

prior day's closing price, on volume of over 6.2 million shares, more than 10 times greater than the July 24 volume.

198.    Through Associate A, who held himself out as a Cedar Lane portfolio manager and used a Cedar Lane email address, Cedar Lane was brought over the wall by Investment Bank F on the Aeterna offering, and Cedar Lane was allocated 333,334 shares in the offering.  Those shares went into the Cedar Lane account at Prime Broker A.  Cedar Lane made $33,929 and Brielle made $52,031 by selling Aeterna stock short after Associate A and Cedar Lane were brought over the wall and ahead of the public announcement of the offering.  Joleine also made $29,493 by selling short Aeterna stock after Associate A and Cedar Lane were brought over the wall and ahead of the public announcement of the offering.  Cedar Lane and Brielle had traded Aeterna securities on only one prior occasion, before another Aeterna offering nearly one year earlier.  The misappropriation of the offering information is detailed below.

199.    Investment Bank F began to contact potential investors in the offering on July 11, 2013.  Using a wall-crossing procedure similar to the procedures employed by Investment Bank A and the other investment banks referenced above, Investment Bank F brought Associate A over the wall on the Aeterna offering on behalf of Cedar Lane on the morning of July 15, 2013. At 9:55 a.m. on July 15, Associate A placed a seven minute call to a banker at Investment Bank F, Investment Banker F-1, and was brought over the wall by Investment Banker F-1 during that call.  While on the phone, Investment Banker F-1 secured Associate A's agreement to keep all information relating to the offering confidential and then provided Associate A with confidential information about the Aeterna offering, including Aeterna's identity.  This information was material and non-public.

200.    Approximately 30 minutes later, at 10:38 a.m. that same morning, Investment Banker F-1 also sent an email to Associate A captioned "Aeterna Zentaris."  That email, which was sent to Associate A's Cedar Lane email address, set out the terms of the agreement pursuant to which Associate A and Cedar Lane were brought over the wall on the Aeterna offering.  The email expressly stated that Associate A was receiving "confidential information relating to the potential sale of securities by Aeterna" and that "[b]y accepting this information, you agree that you and your firm are 'over-the-wall' and that this information will not be circulated within your firm other than on a need to know basis and that it will not circulate outside of your firm, whatsoever."  A document from Investment Bank F labeled "Investor Contact Log" also confirms that Associate A, as a representative of Cedar Lane, was confidentially solicited to participate in the Aeterna offering and brought over the wall on the foregoing terms on July 15, 2013.  Those restrictions applied with equal force to Fishoff, Costantin and Chernin, who held themselves out as, and were, Associate A's business partners in Cedar Lane.  After being brought over the wall, Associate A also participated in a "one-on-one" roadshow meeting with Aeterna's CEO and CFO later in the day on July 15, 2013, as stated in a document from Investment Bank F labeled "List of Presentations/Meetings from June 24 to July 30, 2013."

201.    Fishoff and Chernin knowingly violated the confidentiality agreement and misappropriated the Aeterna offering information.  Associate A passed the Aeterna offering information on to Fishoff and Chernin, as well as to Costantin, over the phone and by email, and Fishoff also learned of the Aeterna offering from Chernin.  After Fishoff and Chernin learned of the offering, Chernin sold Aeterna stock short and Fishoff tipped Petrello about the offering.  After Fishoff's tip, Petrello also shorted Aeterna stock, and they both passed the confidential Aeterna offering information on to Spera, who then also shorted the stock.  These

communications and trades all occurred after Investment Bank F brought Associate A over the wall on the Aeterna offering and before the offering was publicly announced.

202.    Associate A discussed the Aeterna offering with Costantin and Chernin immediately after being brought over the wall on the morning of July 15, 2013, and Chernin began shorting Aeterna stock and tipped Fishoff later that morning.  Associate A's first call after the call with Investment Banker F-1 in which Associate A was brought over the wall was made to Chernin and Costantin.  At 10:35 a.m., Associate A placed a nineteen minute call to Chernin and conferenced in Costantin one minute into the call.  Immediately following that call, at 10:55 a.m., Chernin called Costantin for almost four minutes and then placed calls to Fishoff at 11:05 a.m., 11:33 a.m., and 12:48 p.m.  Just before the third call to Fishoff, Chernin received another call from Associate A, at 12:44 p.m. for two minutes.  Shortly after this series of calls -- at 2:29 p.m. -- Chernin began shorting Aeterna stock online in a Cedar Lane DVP account, selling short a total of 11,000 shares of Aeterna stock that day.

203.    In addition to the telephone conversations with Chernin described above, Fishoff also received confidential information about the Aeterna offering from Associate A by email on July 15, 2013, before Chernin began shorting Aeterna stock and before Fishoff tipped Petrello. As described above with respect to the email addresses of Chernin and Costantin, all emails sent to Associate A's Cedar Lane email address were automatically forwarded to Fishoff's email address beginning no later than July 13, 2013.  As a result, Fishoff received, at the time it was sent, the email that Investment Banker F-1 sent to Associate A at 10:38 a.m. on July 15, 2013 containing confidential information about the Aeterna offering and setting forth the prohibitions on disclosure and misuse of the information to which Associate A had agreed on behalf of Cedar Lane.

204.    Pursuant to the scheme, Fishoff tipped Petrello about the Aeterna offering early in the afternoon of July 15, 2013 and Petrello then traded on the basis of that information a few hours later in a Brielle DVP account.  At 1:10 p.m. that day -- after participating in the calls described above and receiving Investment Banker F-1's "over the wall" email to Associate A -- Fishoff called Petrello for 17 minutes.  At 3:48 p.m. that same day, Petrello began shorting Aeterna stock online in a Brielle DVP account.  Fishoff disclosed confidential Aeterna offering information that he had received from Chernin and Associate A to Petrello before Petrello executed this short sale, and thereafter.  Over the course of that day, Brielle sold short a total of 22,206 shares of Aeterna stock.

205.    Pursuant to the scheme, Fishoff also tipped Spera about the Aeterna offering.  On July 16, 2013, the day after Chernin and Petrello began selling shares of Aeterna, Spera traded on the basis of that information in Joleine's DVP account at 2:51 p.m. in the afternoon using his online account platform with DVP Broker C.

206.    Between July 15, 2013 and the announcement of the Aeterna offering on the morning of July 25, 2013, Associate A continued to speak frequently to Chernin, Costantin and Fishoff and to the bankers from Investment Bank F about the Aeterna offering, and Fishoff spoke often with Petrello.  For example, on July 23 at 5:01 p.m., Investment Banker F-1 emailed Associate A to inform him that Investment Bank F was "looking at tomorrow night for [Aeterna]" and then called Associate A at 7:37 p.m. for four minutes.  Investment Banker F-1's July 23 email was automatically forwarded to Fishoff, and Associate A called Fishoff for six minutes at 7:51 p.m. that night, just minutes after Associate A's call with Investment Banker F-1 ended.  Fishoff forwarded Investment Banker F-1's email to Petrello that evening.  Chernin and Petrello also continued to short Aeterna stock during this period.  Through the close of trading on

July 24, 2013, Chernin built a total open short position of 104,700 shares in a Cedar Lane account at an average sale price of $1.82 per share, Petrello built a total open short position of 116,053 shares in a Brielle account at an average sale price of $1.83 per share, and Spera built a total open short position of 111,000 shares in a Joleine account at an average sale price of $1.76 per share.

207.    On July 25, 2013, after the Aeterna offering and the $1.50 per share offering price were announced and the market price dropped, Cedar Lane, Joleine and Brielle profited by covering their entire short positions at the reduced market price.  Cedar Lane also obtained 333,334 Aeterna shares in the offering and transferred 222,000 of those shares to Brielle at the offering price, which Brielle used to cover its short position.  Brielle in turn transferred 111,000 of those shares to Joleine at the offering price, which Joleine used to cover its short position.

**Common Elements in Each Instance of Insider Trading Before an Offering**

208.    In each of the foregoing instances, the information regarding the subject securities offering that was provided to Chernin, Fishoff and/or Costantin, and Spera after one or more of them was brought over the wall on the offering was material and non-public.  In addition, that information was, in each instance, considered to be, and treated as, confidential by the issuer of the securities and by the investment bank underwriting and marketing the offering.  In each instance, both the issuer and the investment bank had policies and procedures in place to protect the confidentiality of the material non-public offering information, including the use of confidentiality agreements that each potential investor in the offering was required to enter into before receiving the material non-public information about the offering.  In each instance, the requisite confidentiality agreement prohibited the potential investor from, among other things, disclosing the material non-public offering information, which included the identity of the issuer,

to any third party, trading in the securities of the issuer or using the information for any purpose other than determining whether to invest in the offering.  In each relevant instance, Chernin, Fishoff and/or Costantin, and Spera entered into, or were otherwise bound by, such a confidentiality agreement before they were brought over the wall and received material non-public information about the offering.  The terms of each such confidentiality agreement also applied with equal force to each entity through which Chernin, Fishoff and/or Costantin, and Spera acted in each relevant instance.

209.    In each instance in which Chernin, Fishoff, Petrello, and Costantin are alleged to have passed material non-public information about an offering to another person (*i.e.*, to have tipped such person, their "tippee," about the offering), they did so with the expectation of obtaining, and they obtained, a benefit from doing so, including, but not limited to, monetary gain, friendship and/or familial bonds.  In each such instance, Chernin, Fishoff and/or Costantin either (i) conveyed the material non-public offering information in breach of a confidentiality agreement into which one or more of them had entered in exchange for receiving such information from the issuer and/or the issuer's investment banker and thereby breached a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the source of the information; or (ii) had themselves obtained or misappropriated the material non-public offering information through the breach of a confidentiality agreement into which one or more of them had entered in exchange for receiving such information from the issuer and/or the issuer's investment bank, and therefore obtained such information through the breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the original source of the information.  In each such instance, Chernin, Fishoff and/or Costantin also knew, recklessly disregarded or should have known that they

conveyed or obtained the information in breach of such duty and/or obligation; and they also knew, recklessly disregarded or should have known that the tippee would use the information to trade securities and/or convey the information to other persons for the purpose of trading securities.

210.    In each instance in which Fishoff, Chernin and Costantin are alleged to have received material non-public information about an offering from someone other than the issuer or the investment banker marketing the offering (*i.e.*, to have been tipped by such person, their "tipper," about the offering), (i) the tipper conveyed such information with the expectation of obtaining, and did obtain, a benefit from doing so; and (ii) Fishoff, Chernin and Costantin knew, recklessly disregarded or should have known that the tipper(s) conveyed such information with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain, friendship and/or familial bonds.  In each such instance, Fishoff, Chernin and/or Costantin knew, recklessly disregarded or should have known that the information they received was disclosed or misappropriated by the tipper, or had been disclosed or misappropriated by the tipper's source, in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the original source of the information.

211.    In each instance in which Petrello is alleged to have received material non-public information from (*i.e.*, to have been tipped by) Fishoff about an offering, Petrello knew, recklessly disregarded or should have known that both Fishoff and Fishoff's tipper(s) conveyed such information with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain and/or friendship.  In each such instance, Petrello knew, recklessly disregarded or should have known that the information he received was disclosed or misappropriated by Fishoff, or had been disclosed or misappropriated by Fishoff's

source, in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the original source of the information. As alleged above, Petrello paid Fishoff hundreds of thousands of dollars through entities Petrello controlled.

212. In each instance in which Spera is alleged to have received material non-public information from (*i.e.*, to have been tipped by) Fishoff and/or Petrello about an offering, Spera knew, recklessly disregarded or should have known that Fishoff and/or Petrello and their tipper(s) conveyed such information with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain and/or friendship. In each such instance, Spera knew, recklessly disregarded or should have known that the information he received was disclosed or misappropriated by Fishoff and/or Petrello, or had been disclosed or misappropriated by Fishoff and/or Petrello's source, in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the original source of the information. As alleged above, Spera paid Fishoff hundreds of thousands of dollars through accounts Spera controlled.

213. In each instance in which Fishoff, Chernin, Costantin, Petrello, and Spera are alleged to have sold, or directed the sale of, securities of an issuer in advance of a secondary or follow-on offering by such issuer, they did so while in possession of material non-public information about such offering. In each such instance, Fishoff, Chernin, Costantin, Petrello, and Spera knew, recklessly disregarded or should have known that (i) such trading breached a fiduciary duty, or obligation arising from a relationship of trust and confidence, that they owed to the issuer and/or to the source of the information; and/or (ii) the material non-public information about the subject offering which they possessed was disclosed or misappropriated in breach of a

fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the issuer and/or to the original source of the information.

214.     In each relevant instance, the conduct and scienter of Fishoff, Chernin, Costantin, Petrello, and Spera is attributable to the respective entities through which they acted, including the entities through which they traded and the entities through which they obtained material non-public information about securities offerings.  Specifically, the conduct and scienter of Fishoff is attributable to Featherwood, Gold Coast, Data Complete, Seaside, Cedar Lane and Oceanview; the conduct and scienter of Chernin is attributable to Featherwood, Gold Coast, Data Complete and Cedar Lane; the conduct and scienter of Costantin is attributable to Featherwood, Seaside and Cedar Lane; the conduct and scienter of Petrello is attributable to Brielle and Oceanview; and the conduct and scienter of Spera is attributable to Joleine.  Similarly, each of the securities transactions effected though accounts held in the names of the respective entities through which Fishoff, Chernin, Costantin, Petrello, and Spera traded are attributable to Fishoff, Chernin, Costantin, Petrello, and Spera, because they, directly or indirectly, effectuated the relevant securities transactions in those accounts.

**Insider Trading in Advance of the Sangamo-Biogen Announcement**

215.     Although the modus operandi for the insider trading scheme typically involved misappropriating confidential offering information and then shorting those stocks, Fishoff, Petrello, Chernin, and Spera also unlawfully traded Sangamo securities on the basis of material non-public information tipped by Associate A about a potential business combination between Sangamo and Biogen, two large pharmaceutical companies.  Associate A received the information from Insider A, a longtime friend and business associate who works for Sangamo as

a corporate officer and who passed the material non-public information on to Associate A in violation of a duty of confidentiality that Insider A owed to Sangamo.

**Associate A's Relationship with Insider A**

216.    As discussed above, Associate A holds himself out as a portfolio manager for Cedar Lane, and he has operated under the direction of Fishoff, Chernin and Costantin since at least October 2012.  Insider A has been Vice President of Clinical Research at Sangamo since January 2010, and he and Associate A and Insider A have been close friends and business associates for at least ten years.

217.    Associate A and Insider A first met in or about the early 2000s when Insider A was the head of health care investments for a private equity firm.  The two of them maintained a very close personal friendship and professional relationship throughout the relevant period. Insider A has received payments from Associate A during the course of their relationship.  In addition, Insider A provided a recommendation letter for Associate A when the latter applied for a fellowship in 2010.  The two speak together frequently by cell phone and exchange personal emails.  Prior to and during 2014, Associate A and Insider A also collaborated on a joint business venture, seeking to license technologies from a cancer research center in order to fund and develop new cancer treatments.

218.    Insider A was aware that Associate A's business-related activities included seeking out non-public information about companies and, if successful in doing so, passing such information on to persons who traded on the basis of such information and compensated Insider A for the information.  Insider A was also aware that such activities included instances of Associate A obtaining and providing confidential "tips" that involved illegal insider trading. With knowledge of the foregoing, Insider A conveyed non-public information about Sangamo to

84

Associate A on multiple occasions, including in the circumstances described below, and Associate A informed Insider A that Associate A made a substantial amount of money from the information that he received from Insider A.

### Insider A's Knowledge of the Confidential Sangamo-Biogen Negotiations

219.    From approximately January 2013 through January 8, 2014, Sangamo and Biogen conducted ongoing confidential negotiations regarding a possible collaboration and licensing agreement with respect to the development of therapeutic treatments for certain illnesses.  The licensing agreement was announced before the market opened on January 9, 2014.  Following the announcement, Sangamo's stock price increased by over 38 percent, from a closing price of $13.65 per share on January 8 to a closing price of $18.88 on January 9.

220.    As a Vice President of Clinical Research at Sangamo, Insider A had regular access to material non-public information in the course of his employment at Sangamo.  By December 5, 2013, Insider A was informed of Sangamo's negotiations with Biogen, including at a discussion of the transaction at a senior management meeting that he attended.  This information was material and non-public.

221.    Under Sangamo company policies and his employment contract, Insider A was obligated to maintain the confidentiality of Sangamo's business information.  These policies specifically prohibited Insider A from disclosing material non-public information concerning Sangamo, including confidential information about the negotiations with Biogen.  Sangamo considered that information to be, and treated it as, confidential and had procedures in place to protect the confidentiality of that and other non-public business information.

222.    As detailed below, Insider A breached his duty of confidentiality to Sangamo and its shareholders by tipping Associate A about Sangamo's negotiations with Biogen.  Associate A

in turn tipped at least Chernin and Costantin, who tipped Fishoff, and Fishoff then tipped Petrello and Spera, one after the other.  This series of tips led to significant trading in Sangamo securities by Fishoff, Petrello, Spera, and Chernin ahead of the January 9, 2014 announcement.

**The Tipping and Trading Before the Announcement**

223.    Insider A communicated material non-public information about the Sangamo-Biogen negotiations to Associate A no later than December 16, 2013.  Following Insider A's tip, the following sequence occurred on December 16, 2013 within a span of 31 minutes:  (i) Associate A tipped Chernin and Costantin about the negotiations; (ii) Chernin bought Sangamo stock; (iii) Costantin tipped Fishoff about the negotiations; (iv) Fishoff bought Sangamo stock; and (v) Fishoff tipped Petrello and Spera, who both then also bought Sangamo stock.

224.    Starting on December 7, 2013 -- two days after Insider A learned of the negotiations -- Associate A and Insider A exchanged numerous calls, and Associate A also exchanged numerous calls with Chernin, Costantin and Fishoff.  On December 16 (a Monday), Insider A unsuccessfully placed a call from his cell phone to Associate A's cell phone at 12:51 p.m. but, as the following events demonstrate, they then communicated through other means prior to 1:38 p.m.  At 1:38 p.m., Associate A held a conference call with Chernin and Costantin for nearly seven minutes.  Right after that call ended, at 1:45 p.m., Costantin placed an 8-second call to Fishoff.  One minute later, at 1:46 p.m., Chernin began to purchase Sangamo stock, executing a buy order through an electronic trading platform for 800 shares that settled into the Cedar Lane account at Prime Broker A.  At 1:52 p.m., just minutes after receiving the call from Costantin, Fishoff also began to purchase shares of Sangamo stock, executing a buy order through an electronic trading platform of 1,000 shares that settled into the Featherwood account at Prime Broker A.  At 2:05 p.m., Fishoff received an 11-second call from Petrello.  At 2:06

p.m., Fishoff returned Petrello's call and spoke with him for four minutes.  At 2:09 p.m., Petrello also began to purchase Sangamo stock, executing a buy order through an electronic trading platform of 2,500 shares that settled into the Brielle account at Prime Broker A.  The next call Fishoff placed after speaking with Petrello was to Spera, at 2:13 p.m. for almost two minutes. Within a minute of that call ending, Spera executed a purchase of 10,000 Sangamo shares through his online trading account for Joleine.  Between December 16 and 20, Spera executed the purchase of 50,000 shares of Sangamo online for his Joleine account.

225.    Insider A continued to pass confidential information about the status of the Sangamo-Biogen negotiations on to Associate A between December 16, 2013 and the announcement on January 9, 2014, and Associate A continued to pass that information on to Chernin, Costantin and Fishoff during this period.  Chernin, Fishoff, Petrello, and Spera continued to purchase Sangamo stock through December 23, and Fishoff, Chernin and/or Costantin also purchased Sangamo call options in Featherwood and Cedar Lane accounts on December 17 and 20.  Associate A remained in constant phone contact with Chernin, Costantin and Fishoff during this period, and also had further communications with Insider A.  Fishoff, in turn, continued to communicate regularly with Chernin, Costantin, Petrello, and Spera.

226.    For example, on December 19, 2013, Associate A placed a one-minute call to Insider A, and on December 20 at 6:47 p.m., Insider A called Associate A for over 15 minutes. On December 23 at 3:49 p.m., Associate A called Chernin for two minutes.  As soon as that call ended, at 3:51 p.m., Chernin called Fishoff for two minutes.  At 3:53 p.m., Fishoff executed a buy order for 20,000 shares of Sangamo stock, half of which settled into the Featherwood account and half of which settled into his JSF account at Prime Broker A.

227.    On the evening of December 23, 2013, Associate A placed several calls to Insider A after business hours.  Early the next morning, at 9:38 a.m. on December 24, Associate A placed a call to Chernin but did not reach him on that call.  However, at 9:39 a.m., Chernin called Associate A back and they spoke for approximately one-and-one-half minutes.  Those calls were immediately followed by a call from Chernin to Fishoff, and then calls from Petrello to Fishoff.  On that same day (December 24), the Featherwood, Cedar Lane and Brielle accounts all began to sell off portions of their Sangamo positions.

228.    However, starting on the morning of December 26, 2013, Associate A again exchanged calls with Chernin, Costantin and Fishoff, and Fishoff received a call from Petrello.  After these calls, the Featherwood and Brielle accounts resumed making purchases of Sangamo stock.  The Cedar Lane account continued to sell Sangamo shares into January 2014, but purchased additional call options and shares on January 7 and 8, respectively.  Associate A continued to communicate with Chernin, Costantin and Fishoff during this period, and also spoke with Insider A by phone for approximately seven and a half minutes on January 2.  After the Sangamo-Biogen transaction was announced on the morning of January 9, Associate A received two calls from Insider A, one of which lasted for approximately 15 minutes, and also exchanged numerous calls with Chernin, Costantin and Fishoff.  Associate A continued to exchange calls with Insider A, Chernin, Costantin and Fishoff over the next few days.

229.    Between December 16, 2013 and January 8, 2014, the following Sangamo securities trades and unlawful trading profits were made by the relevant parties:  (i) Featherwood purchased 76,500 shares at an average price of $13.55 per share, sold 23,500 shares at an average price of $14.01 per share, bought 400 call option contracts at $2.93 per contract and 152 call option contracts at $2.30 per contract, generating a total unlawful profit of $555,487 on its open

positions at the time of the announcement; (ii) JSF purchased 10,000 share at an average price of $14.35 per share and sold 10,000 shares at an average price of $18.22 per share, generating a total unlawful profit of $38,711 on its open positions at the time of the announcement; (iii) Cedar Lane purchased 109,000 shares at an average price of $13.26 per share, sold 75,000 shares at an average price of $13.72 per share, and bought 250 call option contracts at $2 per contract and 250 call option contracts at $3.8 per contract, generating a total unlawful profit of $398,130 on its open positions at the time of the announcement; (iv) Petrello purchased 5,000 shares in his personal account at an average price of $12.50 per share, while the Brielle account purchased 45,500 shares at an average price of $13.32 per share and sold 2,000 shares at an average price of $14.057 per share, generating a total unlawful profit of $221,632 on all his open positions at the time of the announcement; and (v) Spera's Joleine account purchased 50,000 shares, generating a total unlawful profit of $287,805 on its open positions at the time of the announcement. Collectively, these individuals and entities made over $1.48 million in profits trading Sangamo securities while in possession of material nonpublic information about the Sangamo-Biogen negotiations that Associate A had obtained from Insider A in breach of Insider A's duty to Sangamo.

230.    Less than a month later, on February 11, 2014 Spera wired $139,658, comprising approximately half of his Sangamo trading profits, to Fishoff.

231.    The next day, on February 12, as compensation for tipping Fishoff, Chernin, and Costantin about the Sangamo-Biogen negotiations, Associate A received, through an entity that Associate A controlled, a wire transfer from Cedar Lane in the amount of $222,788.  That amount was far larger than any prior payment to Associate A from Cedar Lane or any other entity controlled by or associated with Fishoff.

**The Resulting Breaches of Duty**

232.    Insider A provided material non-public information about the Sangamo-Biogen negotiations to Associate A in in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, that Insider A, as a corporate officer and employee of Sangamo, owed to Sangamo and its shareholders, and Insider A knew, recklessly disregarded or should have known that he breached that duty by doing so.  Associate A knew, recklessly disregarded or should have known that Insider A breached a fiduciary duty, or obligation arising from a relationship of trust and confidence, that Insider A owed to Sangamo by providing Associate A with material non-public information about the Sangamo-Biogen negotiations. Insider A conveyed material non-public information about the Sangamo-Biogen negotiations to Associate A with the expectation of obtaining, and he obtained, a benefit from doing so, including, but not limited to, friendship and/or monetary gain.  Associate A knew, recklessly disregarded or should have known that Insider A conveyed material non-public information about the Sangamo-Biogen negotiations to him with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, maintaining or furthering their friendship and/or potential or actual monetary gain.  Insider A also knew, recklessly disregarded or should have known that Associate A would use the information either to trade securities or convey the information to other persons for the purpose of trading securities.

233.    Associate A conveyed material non-public information about the Sangamo-Biogen negotiations to Chernin, Costantin, and Fishoff with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain and/or furthering his business relationship with them.  Associate A also knew, recklessly disregarded or should

have known that Chernin, Costantin, and Fishoff would use the information to trade securities and/or convey the information to other persons for the purpose of trading securities.

234.    Chernin, Costantin, and Fishoff knew, recklessly disregarded or should have known that the material non-public information that they received from Associate A about the Sangamo-Biogen negotiations had been conveyed (i) in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information; and (ii) with the expectation of a personal benefit to the person who owed such duty or obligation to the original source of the information.  Chernin, Costantin and Fishoff knew, recklessly disregarded or should have known that Associate A conveyed the information to them with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain and/or friendship.

235.    Chernin and Costantin conveyed material non-public information about the Sangamo-Biogen negotiations to Fishoff with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain, friendship, and/or furthering their overall business relationship.  Chernin and Costantin also knew, recklessly disregarded or should have known that Fishoff would use the information to trade securities and/or convey the information to other persons for the purpose of trading securities.  Fishoff knew, recklessly disregarded or should have known that the information that he received from them about the Sangamo-Biogen negotiations had been conveyed (i) in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information; and (ii) with the expectation of a personal benefit to the person who owed such duty or obligation to the original source of the information.  Fishoff also knew, recklessly disregarded or should have known that Chernin and Costantin conveyed the information to him with the

91

expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, monetary gain, friendship and/or familial bonds.

236.    Fishoff and Chernin knew, recklessly disregarded or should have known that when they traded Sangamo securities, they did so while in possession of material non-public information about the Sangamo-Biogen negotiations which had been conveyed in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information.

237.    Fishoff conveyed material non-public information about the Sangamo-Biogen negotiations to Petrello and Spera with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, friendship and/or monetary gain.  Fishoff also knew, recklessly disregarded or should have known that Petrello and Spera would use the information to trade securities.  Petrello and Spera knew, recklessly disregarded or should have known that the information that they received from Fishoff about the Sangamo-Biogen negotiations had been conveyed (i) in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information; and (ii) with the expectation of a personal benefit to the person who owed such duty or obligation to the original source of the information.  Petrello and Spera also knew, recklessly disregarded or should have known that Fishoff conveyed the information to them with the expectation of obtaining, and obtained, a benefit from doing so, including, but not limited to, friendship and monetary gain.

238.    Petrello and Spera knew, recklessly disregarded or should have known that when they traded Sangamo securities, they did so while in possession of material non-public information about the Sangamo-Biogen negotiations which had been conveyed in breach of a

fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information.

**Trading in Violation of Rule 105**

239.    In addition to illegal insider trading, some of the Defendants' short selling in advance of registered public offerings also resulted in violations of Rule 105 of Regulation M under the Exchange Act.  Rule 105 prohibits a person from purchasing securities in an offering underwritten on a "firm commitment" basis and conducted pursuant to a filed registration statement if that person sold short the securities of the same issuer during the applicable restricted period, in this case during the five business days preceding the pricing of the offered securities ("Restricted Period").

240.    In at least one instance, Spera and Joleine purchased securities in an offering underwritten on a "firm commitment" basis and conducted pursuant to a filed registration statement after selling short the securities of the same issuer during the Restricted Period.  The Defendants profited unlawfully in at least two ways from the purchase of offering shares after selling short the same security during the Restricted Period.  First, they profited from the difference between the proceeds of their restricted period short sales and the amounts they paid for an equivalent number of shares received in the offering of the same issuer's shares.  Second, in this particular offering, as the number of shares the Defendants received exceeded the number of shares they sold short during the Restricted Period, they obtained an additional benefit by securing those additional offering shares at a discount to the market price of the issuer's shares.

241.    Joleine was an alter ego of Spera.  Spera is the sole owner of Joleine, and exercised complete dominion and control over the entity and conducted all the relevant trading in

its accounts using his own capital, or directed that trading.  Accordingly, Spera is culpable for the violative conduct in which he engaged through Joleine.

242.    The Synergy offering was underwritten on a firm commitment basis and conducted pursuant to a registration statement filed with the Commission.  The short sales of Synergy stock by Joleine described above occurred during the Restricted Period and, as described above, Joleine then purchased 155,000 shares of Synergy stock in the offering.  By purchasing those Synergy shares in the offering, Joleine made profits of at least $118, 000 attributable to its Rule 105 violations.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Spera and Joleine)

243.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 242.

244.    The Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities by the use of the means of instruments of transportation or communication in interstate commerce, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

245.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Spera and Joleine)

246.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 242.

247.    The Defendants, directly or indirectly, singly or in concert, in connection with the

purchase or sale, of securities by the use of the means of instruments of transportation or

communication in interstate commerce, or of the mails or the facilities of a national securities

exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order

to make the statement made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon other persons.

248.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in

concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Rule 105 of Regulation M of the Exchange Act
### (Spera and Joleine)

249.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 242.

250.    The Defendants, directly or indirectly, singly or in concert, in connection with an

offering conducted on a firm commitment basis of equity securities for cash pursuant to a

registration statement or a notification on Form 1–A (17 C.F.R. § 239.90) or Form 1–E (17

C.F.R. § 239.200) filed under the Securities Act of 1933, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, sold short securities that were the subject of the offering and purchased the offered securities from an underwriter or broker or dealer participating in the offering where such short sales were effected during the shorter of the period:  (1) beginning five business days before the pricing of the offered securities and ending with such pricing; or (2) beginning with the initial filing of a registration statement or notification on Exchange Act Form 1-A or Form 1-E and ending with pricing.

251.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Rule 105 of Regulation M of the Securities Exchange Act [17 C.F.R. § 242.105].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Permanently restraining and enjoining the Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Permanently restraining and enjoining the Defendants from violating Rule 105 of Regulation M of the Exchange Act [17 C.F.R. § 242.105];

**IV.**

Permanently restraining and enjoining Spera from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in a secondary or follow-on offering of any publicly traded security by, among other things, purchasing or offering to purchase securities in such an offering as well as seeking, accepting, receiving, or agreeing to accept or receive non-public information about any such offering from the issuer or from any representative or agent of the issuer, including but not limited to a broker, dealer, or investment banker;

**V.**

Ordering the Defendants, jointly and severally, to disgorge all of the unlawful trading profits and all other ill-gotten gains resulting from the violations alleged in this complaint, and ordering each of them to each pay prejudgment interest thereon;

**VI.**

Ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1]; and

**VII.**

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
      December 11, 2017

Respectfully submitted,

_Sanjay Wadhwa_
Sanjay Wadhwa*
George N. Stepaniuk*
Todd Brody
David C. Austin*
Chevon Walker
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0080 (Brody)
* Not admitted in New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Sanjay Wadhwa
Senior Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0181

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above-captioned action.  Therefore, service upon the United States or its authorized designee, Caroline Sadlowski, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

Sanjay Wadhwa
Senior Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0181